In re BOONE.

(Circuit Court, N. D. California. December 7, 1897.)

No. 12,455.

1. ATTORNEYS—DISBARMENT—POWERS OF FEDERAL COURTS.

The power of the United States courts to disbar attorneys for general unprofessional conduct, or for particular acts of misconduct not coming within any of the three classes of contempts specified in Rev. St. § 725, is unabridged by statute.

2. SAME—DISCRETION OF COURT.

A court has the power to disbar an attorney for any willful breach of his professional obligations, and it is its duty to exercise it in a proper case, though it should be exercised with discretion and care, and only upon clear legal proof.

3. SAME—RELATION OF ATTORNEY AND CLIENT—DUTIES OF ATTORNEY.

An attorney is not permitted, in serving a new client as against a former one, to do anything which will injuriously affect the former client in any matter in which the attorney formerly represented him, though the relation of attorney and client between them has been terminated, and the new employment is in a different case; nor can he use against him any knowledge or information gained through their former connection.

4. SAME—AGREEMENT TERMINATING EMPLOYMENT—CONSTRUCTION.

An agreement terminating the relations between a client and his attorney, and by which the client releases the attorney "from all rights, burdens, obligations, and privileges which appertain to his said employment," and consents that he may engage his services "pro and con as he may see fit," where the attorney did not advise the client that such was the purpose and meaning of the instrument, will not be construed to authorize the attorney to engage in suits against the client involving matters about which the attorney was formerly employed, or to use against the client information confidentially acquired through such employment.

5. SAME—RELEASE OF ATTORNEY FROM OBLIGATIONS IMPOSED BY LAW.

An agreement by a client, which purports to release the attorney from all the duties, burdens, obligations, and privileges incident to the relationship, is too indefinite, and therefore inoperative and void, and cannot jus-

tify a violation of the duties and obligations imposed on the attorney by law.

**6. SAME—WAIVER OF PRIVILEGE BY CONTRACT.**

A contract entered into between client and attorney, for the purpose of binding the former, that the latter may at any time divulge information or knowledge acquired during the professional relation, is not a good waiver of the privilege of confidence and secrecy, and is void.

**7. SAME—GROUNDS FOR DISBARMENT.**

An attorney who had assisted in obtaining a decree in favor of his client, establishing the validity of certain patents, after the termination of his employment wrote to the attorney of an adversary of his client in another suit involving the same patents, falsely stating that he possessed information that the decree was obtained by fraud, and could be reversed, his purpose being to obtain employment, and use the knowledge obtained by virtue of his former employment against his former client. *Held*, that such conduct was ground for disbarment.

Application on petition of A. B. Bowers for the disbarment of John L. Boone.

Crittenden Thornton, for petitioner.
Dunne & McPike, for respondent.

MORROW, Circuit Judge. This is an application for the disbarment of John L. Boone, a duly and regularly admitted and practicing attorney and counselor of this court. The petition for disbarment is made by Alphonzo B. Bowers, and is as follows:

"That your petitioner is, and has been, the plaintiff or complainant in certain actions at law and suits in equity now and of late pending in this court, as follows: (1) A. B. Bowers v. A. W. Von Schmidt; (2) A. B. Bowers v. Williams & Bixler and° Golden State & Miners' Iron Works; (3) A. B. Bowers v. San Francisco Bridge Co. (at law); (4) Same v. Same (in equity); (5) Same v. McNee Bros.; (6) Same v. Pacific Improvement Co.; (7) Same v. City of Oakland; (8) Same v. Oakland Iron Works; (9) Same v. John Hackett et al. That your petitioner is and now, and for a long time has been, the plaintiff or complainant in certain actions at law and suits in equity in the circuit courts of the United States for the circuits and districts hereinafter named: (10) A. B. Bowers v. Linden W. Bates (circuit court, Northern district of Illinois); (11) A. B. Bowers v. Heldmaier & Neu (same court); (12) A. B. Bowers v. American Hydraulic Dredging Co. (same court); (13) A. B. Bowers v. Northwestern National Bank (same court); (14) A. B. Bowers v. Chicago Drainage Commission (same court); (15) A. B. Bowers v. San Francisco Bridge Co. and New York Dredging Co. (circuit court, district of Washington); (16) A. B. Bowers v. The New York Dredging Co. (circuit court, Southern district of New York); (17) A. B. Bowers v. American Dredging Co. (circuit court, Eastern district of Pennsylvania); (18) A. B. Bowers v. Bucyrus Co. (circuit court, district of Wisconsin). That your petitioner is the patentee of the United States under twelve several patents granted to him directly, and is the assignee of eighteen other patents, all connected with the inventions pertaining to the art of dredging, and all and singular the above mentioned and described actions at law and suits in equity were brought to recover damages for and to restrain the infringement of the said patents. That in the action of A. B. Bowers v. A. W. Von Schmidt, lately pending in this court, such proceedings were had that a final decree was duly given and made in favor of your petitioner, and against the defendant therein, enjoining and restraining the defendant from further using said patents, and awarding damages to your petitioner. That in said cause such proceedings were further had that an appeal was taken by defendant to the United States court of appeals for the Ninth circuit, in which, after full argument and due consideration, said decree was in all things affirmed, and an opinion rendered and filed in said causes. That the decisions are of great value to your petitioner, as an explanation and construc-

83 F.—60

tion of the law and the facts in said cause, and the legal validity and construction of the patents therein involved, and are entitled to have, and do have, great weight in other courts of the United States when cited in causes now pending as authority, on account of the thorough and exhaustive examination of the law and the facts in and by the said opinions. That for nearly nine years last past one John L. Boone has been, and now is, an attorney, counselor, and solicitor of this court, and was during said period the attorney, counselor, and solicitor of your petitioner, as plaintiff, in the actions and suits hereinabove mentioned as pending in this court. That as such attorney, counselor, and solicitor said Boone possessed the special and peculiar confidence of your petitioner, and obtained full and complete knowledge of and from your petitioner of all the facts and evidence in said causes. That in the progress of said causes your petitioner paid to said Boone for his services the sum of about four thousand dollars in full of all his just claims and demands against your petitioner, and said Boone in the month of April, 1897, withdrew, by mutual consent, from the employment of your petitioner and the further prosecution of said causes. That thereafter the said Boone, with the full intent and purpose to betray the confidence of your petitioner, and to violate his trust and duty as the attorney, counselor, and solicitor of your petitioner, did offer and seek to be employed and retained by the defendant in the action of A. B. Bowers v. Linden W. Bates, and the other cases hereinbefore mentioned, now pending in the circuit court of the United States in and for the Northern district of Illinois, and, in consideration of such employment and retainer, did assert and suggest to Thomas A. Banning, Esq., of Chicago, Ill., at the said city of Chicago, who was then and there the attorney, solicitor, and counselor of Linden W. Bates, the defendant in said cause, that the decree in the cause of A. B. Bowers against A. W. Von Schmidt, hereinabove mentioned, was procured by fraudulent means, and that he (said Boone) could not remain in the case under the circumstances; thereby meaning and intending to convey to said Banning the idea that he, said Boone, knew that the said decree was procured by false and perjured evidence and testimony, and should not have been rendered or made. That your petitioner is ignorant of the particular or specific evidence to which said Boone intended to refer, and is unable to say more than that the said charge is wholly and entirely false and untrue. That all the evidence and testimony in said cause are and were true and genuine, and no other than just, lawful, and honest means were employed or resorted to by your petitioner in said cause. That said offer and statement by said Boone were made with the full intent and purpose to obtain employment by and from said Linden W. Bates and the other cases, under the pretense that he could and would betray the confidence of your petitioner, and disregard his professional obligations, and thereby assist the said Bates and others to defeat your petitioner's actions against him and them, and to thwart, embarrass, and retard your petitioner's suits and actions now pending. That the said offer and statement were made and intended to defraud the said Bates and others out of any money they might pay to said Boone as the price of his treachery or his testimony or his legal services, under the false pretense that he (said Boone) could or would bring forward any proof of his statement or suggestion made to said Banning. That the said statement and suggestion was a gross breach of duty and lack of respect by the said Boone to this honorable court, and a breach of his professional obligation to maintain the respect due to judicial officers and courts of justice. That many months ensued between the conclusion of taking testimony in said suit and the argument thereof. That many months ensued between the argument and the rendition of the decree. That over a year elapsed between the rendition of the decree and the argument on the appeal. That over eighteen months elapsed between the argument and the affirmance of said decree. That said Boone was present at almost all times at the taking of evidence, and must have known what false and fraudulent evidence was given, and when and by whom it was given, and what alleged fraudulent means were used by petitioner to gain a favorable decree in said cause. And your petitioner further shows that on May 11, 1897, at his office in the city and county of San Francisco, at No. 314 Pine street, the said Boone did say to one Samuel H. Saleno, the agent and attorney in fact of your petitioner, that unless your petitioner would carry out some supposed promise alleged to have been made by your petitioner to said Boone some five

years back, in regard to the payment of money, he (said Boone) would accept the retainer that was awaiting him (meaning the alleged retainer sought by said Boone from Linden W. Bates), and the acceptance would be very disagreeable to Bowers. He, said Boone, further said that statements had been made to him in years gone by that would be proof positive of perjury, and which, if made public by the other side, would result in the complete loss of Bowers' patents, and might involve his liberty,—all of which was said by said Boone with a malicious intent and purpose to intimidate your petitioner, and extort money from him without any just claim or demand therefor."

The respondent filed an answer, to which a demurrer was interposed. The demurrer was sustained, and the respondent thereupon filed an amended answer, in which he denies the charges of unprofessional conduct as charged. Testimony was thereupon taken on both sides, and the question to be determined, broadly stated, is whether or not the charges preferred have been sustained.

There seems to be some discrepancy between the views of counsel as to the number of charges preferred in the petition, counsel for petitioner contending that the allegations of the petition sustain four charges of disbarment, while counsel for respondent claim that they make but two. The respondent, undoubtedly, is entitled to notice of the charges preferred against him, and that these should be set out clearly and unambiguously, so that he may know exactly what he is called upon to meet, and may have ample opportunity of explanation and defense. As was said in Ex parte Robinson, 19 Wall. 505, 512:

"This is a rule of natural justice, and should be equally followed when proceedings are taken to deprive him of his right to practice his profession as when they are taken to reach his real or personal property. And such has been the general, if not the uniform, practice of the courts of this country and of England. There may be cases undoubtedly of such gross and outrageous conduct in open court on the part of the attorney as to justify very summary proceedings for his suspension or removal from office, but even then he should be heard before he is condemned. Citing Ex parte Heyfron, 7 How. (Miss.) 127; People v. Turner, 1 Cal. 148; Fletcher v. Daingerfield, 20 Cal. 430; Beene v. State, 22 Ark. 157; Ex parte Bradley, 7 Wall. 364; Bradley v. Fisher, 13 Wall. 354. The principle that there must be citation before hearing, and hearing or opportunity of being heard before judgment, is essential to the security of all private rights. Without its observance no one would be safe from 'oppression wherever power may be lodged."

See, also, Ex parte Garland, 4 Wall. 378; Randall v. Brigham, 7 Wall. 523, 540; Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569; Ex parte Cole, 1 McCrary, 410, 411, Fed. Cas. No. 2,973; In re Orton, 54 Wis. 382, 384, 385, 11 N. W. 584; Thomas v. State, 58 Ala. 368, 369; State v. Finley, 30 Fla. 325, 11 South. 674.

In my opinion, the petition, stripped of its recitals and legal verbiage, contains, in effect, two general charges of unprofessional conduct, to wit: (1) Seeking to be employed and retained by the defendant in the suit of A. B. Bowers against Linden W. Bates, and in other cases wherein A. B. Bowers, his former client, was plaintiff, which cases were pending in the circuit court of the United States for the Northern district of Illinois, with intent to betray the confidence reposed in him by the petitioner as his client, and to violate his trust and duty as the attorney, counselor, and solicitor of the petitioner. (2) Seeking to intimidate, and extort money from, the

petitioner at an interview had with one H. S. Saleno, a representative of the petitioner.

The evidence introduced shows that there were but two transactions out of which these charges arose, viz.: (1) That in which the respondent sought to be employed, which is the basis of the first charge; and (2) that in which it is claimed the respondent attempted to extort money from the petitioner, which is the basis of the second charge. The accusation that the respondent, in seeking to be employed as above stated, made false representations to the effect that the decree in the Von Schmidt Case had been fraudulently obtained, is properly part of the first charge, and the respondent's conduct in that connection will be considered with respect to it, and not as a separate and distinct charge.

In the United States courts the power to disbar is to be distinguished, as the law now stands, from the power to punish for contempts. The power of the federal courts to punish for contempts is limited by section 725 of the Revised Statutes. See, in this connection, section 20 of the act of September 24, 1789, and the act of March 2, 1831; the former to be found in 1 Stat. p. 83, and the latter in 4 Stat. 487, 488. In the first place, this section limits the power of the court over contempts by providing that it shall not extend to any cases except (1) the misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice; (2) the misbehavior of any of the officers of the court in their official transactions; (3) the disobedience or resistance by any such officer, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the court. In the second place, the power to punish for the contempts specified above is restricted to a fine or imprisonment, to the exclusion of any other mode of punishment, including, of course, disbarment. Ex parte Robinson, 19 Wall. 505, 512. But the power to disbar an attorney is inherent in all courts which have the power to admit attorneys, and is necessary to the due and orderly administration of justice, and the protection of the profession itself, and, in so far as the power is exercised for general unprofessional conduct or for particular acts of misconduct not coming within any of the three general classes of contempts specified in section 725, Rev. St., it remains unabridged. The power is exercised, generally, where the attorney proceeded against is shown to have been guilty of such conduct as stamps him to be unfit to remain a member of the profession. Ex parte Robinson, supra. It is not necessary that the acts or conduct complained of should be such as would subject the attorney to an indictment or to any civil liability. Any conduct on the part of an attorney showing his unfitness for the confidence and trust which attend the relation of attorney and client and practice of law before the courts, or indicating such a lack of personal honesty, or of good moral character (although it is not every moral delinquency that will justify disbarment), as to render him unworthy of public confidence, constitutes a ground for his disbarment. 3 Am. & Eng. Enc. Law (2d Ed.) p. 302, and cases there cited; Weeks, Attys. §§ 80, 81, and cases there collated. In brief, the court has the power to disbar an at-

torney for any willful breach of his professional obligations, and not only has it the power, but, whenever a proper case is made out, it is its duty to exercise this power. People v. Barker, 56 Ill. 299; Amey v. Long, 9 East, 481; Jackson v. French, 3 Wend. 337; Coveney v. Tannahill, 1 Hill, 33; Beene v. State, 22 Ark. 157; State v. Holding, 1 McCord, 380; Ex parte Brounsall, Cowp. 829; Bryant's Case, 24 N. H. 149; Smith v. State, 1 Yerg. 228; Ex parte Burr, 9 Wheat. 529. The power should, however, be used with care and discretion, for the infliction of disbarment is regarded as a very severe punishment, and should be exercised only upon clear legal proof. In Ex parte Burr, supra, Mr. Chief Justice Marshall, in speaking generally of the power to suspend and disbar, said:

"On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved. For these objects, some controlling power, some discretion, ought to reside in the court. This discretion ought to be exercised with great moderation and judgment, but it must be exercised."

And in the case of Bradley v. Fisher, 13 Wall. 354, the following apt language was used:

"The power of removal from the bar is possessed by all courts which have authority to admit attorneys to practice. It is a power which should only be exercised for the most weighty reasons, such as would render the continuance of the attorney in practice incompatible with a proper respect of the court for itself, or a proper regard for the integrity of the profession. * * * Admission as an attorney is not obtained without years of labor and study. The office which the party thus acquires is one of value, and often becomes the source of great honor and emolument to its possessor. To most persons who enter the profession it is the means of support to themselves and their families. To deprive one of an office of this character would often be to decree poverty to himself and destitution to his family. A removal from the bar should, therefore, never be decreed where any punishment less severe—such as reprimand, temporary suspension, or fine—would accomplish the end desired. * * * The obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar, is not merely to be obedient to the constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers."

See, also, Ex parte Secombe, 19 How. 9.

Having stated the main considerations which govern the action of the United States courts in the disbarment of an attorney, I will now proceed to state the facts of this application as briefly as possible.

The petitioner, Alphonzo B. Bowers, is the inventor of certain machines for and improvements in the art of hydraulic dredging. He is the patentee of 12 several patents granted to him directly, and is the assignee of 18 other patents, all relating to inventions pertaining to the art of dredging. His rights as inventor and owner of the patents referred to have been established after long, continuous, and arduous litigation. In this court alone he has been complainant in no less than nine suits, both at law and in equity, involving the validity of his patents. An equally large number of suits has been brought by him in other circuit courts, both on the Pacific coast and in the East. A number of these suits are, and at

the time of the acts of unprofessional conduct complained of were, pending. The petitioner has been uniformly successful in this litigation, and in the case of Bowers against Von Schmidt, instituted in this court, the validity of his inventions and patents in the art of dredging were thoroughly and exhaustively considered both in this court and the circuit court of appeals. 63 Fed. 572, affirmed in 25 C. C. A. 323, 80 Fed. 121. The petitioner was declared a pioneer inventor in the art of hydraulic dredging, and fully entitled to his patents Nos. 318,859 and 355,251. In the course of this long litigation, and, in fact, it would seem, at its very inception, the petitioner employed the services of the respondent, John L. Boone, as his attorney, counselor, and solicitor. It is averred in the petition, and admitted by the answer, that the respondent acted as the petitioner's attorney for nearly nine years, and then withdrew, by mutual consent, from the employment of the petitioner in April, 1897. The respondent, however, while admitting in his amended answer that he did not withdraw from the employment of the petitioner until April, 1897, when it was mutually agreed that he should do so, nevertheless denies that for the last two years preceding his withdrawal in April, 1897, he had been actively engaged in the prosecution of the suits of petitioner. This denial may, however, be treated as immaterial, in view of the admission that he still remained as the petitioner's attorney of record. The professional relations existing between the petitioner and the respondent were finally terminated on May 1, 1897, when they entered into a mutual contract of release. For at least seven years, therefore, the respondent was actively engaged in representing the petitioner as one of his attorneys in the litigation affecting the validity of his invention and patents. He appeared in several of the cases brought in this court, among which were those of Bowers against Von Schmidt, already referred to, and Bowers against the San Francisco Bridge Company. In these cases the respondent was associated with Mr. John H. Miller, who has remained as the petitioner's attorney in the patent litigation, but does not appear as his legal representative in this proceeding to disbar. The case of Bowers against the San Francisco Bridge Company is an action at law. It was tried before a jury, and resulted in a disagreement. During the course of the trial the respondent went upon the witness stand and testified as a witness on behalf of the petitioner, the plaintiff in the case. The case of Bowers against Linden W. Bates is a suit brought by the petitioner in the circuit court for the Northern district of Illinois, and was pending at the time the alleged acts of unprofessional conduct took place. It does not appear that the respondent ever represented the petitioner in that case. One Thomas A. Banning of Chicago, Ill., was the attorney for Linden W. Bates, the defendant in the case.

Having made this preliminary statement of such general and uncontested facts as are necessary to a proper understanding of the matter, I now proceed to consider the evidence presented with respect to the first charge, viz.: That the respondent sought the employment of the defendant in the case of Bowers against Bates with

the intent to betray the confidence Bowers had reposed in him while the respondent acted as his attorney.

The evidence shows conclusively that the respondent, on June 11, 1897, wrote the following letter to Thomas A. Banning, the attorney for Mr. Bates in the action of Bowers against Bates:

"Telephone, Main 5,410.

"John L. Boone, Attorney and Counselor at Law.

"Practices in State and Federal Courts.    Patent Law a Specialty.    Rooms 43, 44, 45, 214 Pine Street.

"San Francisco, June 11th, 1897.

"Mr. Thomas Banning—Dear Sir:   Yours of June 4th received.   Without in any way reflecting upon your good faith and integrity, it would hardly be advisable for me to put in physical evidence the information I referred to, without knowing what use would be made of it, or what my position in regard thereto would be.   Suffice it to say that my relation to this case qualifies me to state that the fact I refer to is not simply an important one, but it is a vital one.   In my opinion it will reverse the decree already rendered, and will take the sting out of Bowers' patents.   Mind you, Mr. Bowers and I have never quarreled; we never had a word of misunderstanding.   Since the incident I refer to occurred I have refrained from taking any active part in his case.   My withdrawal from his case was voluntary on my part after he had obtained his final decree in the Von Schmidt Case.   I drew the contract of mutual release myself, without any previous conversation with him, and after signing it I sent it to him for his signature.   He did not even know that I contemplated withdrawing from his case.   He never refused to pay me any money,—in fact, I have never asked him for a cent.   My withdrawal was because I knew the decree was fraudulently obtained, and I could not remain in the case under such circumstances.   In my release Bowers releases me from all obligations, rights, and privileges, and consents that I may take employment contra, so that I am perfectly free to take employment from Mr. Bates or from any one else without in any way violating my professional honor.   If I had remained in the case with Bowers, and he had been finally successful, there is no doubt but what I would have been largely paid, but I sacrificed all that to my sense of right and duty.   I hardly know what to suggest under the circumstances, but you can readily see that it would not be wise for me to give my knowledge on paper at this time.   If Mr. Bates wants to retain me, then it is another matter, as I am free to accept his employment.

"Very truly yours,                                              Jno. L. Boone."

The respondent himself admitted that he had written and sent the letter, so that there is no question of fact about this matter.   The most cursory reading of the letter tends to show that the respondent was offering his services to Mr. Bates, Mr. Banning's client, and, as an inducement for such employment, declared that he possessed important knowledge, which his relation to the case qualified him to state was vital, and would reverse the decree already rendered establishing the validity of Bowers' patents, and that this knowledge consisted in his knowing that the decree in the Von Schmidt Case had been fraudulently obtained.   In what respect the decree had been fraudulently obtained does not appear from the letter sent to Mr. Banning.   There is simply the bare assertion that the respondent was possessed of knowledge that it had been so obtained.   What he meant in this regard was subsequently developed from his own testimony, and will be referred to later on.   The letter, from its terms, indicates that it was in reply to a letter the respondent had received

from Mr. Banning, which, in turn, as appears from the testimony of the respondent, was in reply to a letter sent by the respondent to Mr. Bates, and appears to have been the first communication by the respondent to Messrs. Bates and Banning in which he broached the subject of his employment and the knowledge he possessed. It was not, however, introduced in evidence, but the respondent testified to its contents as follows:

"I wrote Mr. Bates a letter about the 1st of June. It was a letter, I think, of about five or six lines only, wherein I stated to him that I had withdrawn from the employment of Mr. Bowers, and had his written consent to take employment on the other side. I further said that I was in possession of knowledge that would be important in the litigation, and ended the letter by simply saying, 'What have you got to say about it?' That is all that was said in that letter."

Any doubt about the purpose of these letters is set at rest by the admission of the respondent, in his testimony, that they were written with the end in view of being employed by Mr. Bates. He denied, however, that he ever intended to disclose any of the secrets or knowledge he had obtained during the course of his professional relations with Mr. Bowers, but that he simply intended, if employed, to use such information and knowledge in the cross-examination of witnesses and in his conduct generally of the case. It will be observed that the respondent had withdrawn from the petitioner's employ on May 1, 1897, on which day the mutual contract of release was executed, and that the offer of his services to Mr. Bates took place some time in the month of June following.

It is the general and well-settled rule that an attorney who has acted as such for one side cannot render services professionally in the same case to the other side, nor, in any event, whether it be in the same case or not, can he assume a position hostile to his client, and one inimical to the very interests he was engaged to protect; and it makes no difference, in this respect, whether the relation itself has been terminated, for the obligation of fidelity and loyalty still continues. Parker v. Parker, 99 Ala. 239, 13 South. 520; Spinks v. Davis, 32 Miss. 154; Cantrell v. Chism, 5 Sneed (Tenn.) 116; Clarke Co. v. Commissioners of Clarke Co., 1 Wash. T. 250; Valentine v. Stewart, 15 Cal. 387; Burridge v. Pearson, 55 Cal. 472; In re Stephens, 77 Cal. 357, 19 Pac. 646; Id., 84 Cal. 77, 24 Pac. 46; In re Cowdery, 69 Cal. 32, 10 Pac. 47; Gibson v. Jeyes, 6 Ves. 278; Earl Cholmondeley v. Lord Clinton, 19 Ves. 260; Herrick v. Catley, 1 Daly, 512; Sherwood v. Railroad Co., 15 Barb. 650; Hatch v. Fogerty, 40 How. Prac. 492; U. S. v. Costen, 38 Fed. 24; Weeks, Attys. § 120; 3 Am. & Eng. Enc. Law (2d Ed.) pp. 295–300. Of course, it is conceded that an attorney may represent his client's adversary with perfect propriety whenever their interests are not hostile to each other. The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be

called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection. Price v. Railroad Co., 18 Ind. 137; Bent v. Priest, 10 Mo. App. 543. An attorney cannot use the knowledge acquired confidentially from his client in trafficking with his client's interests. Hatch v. Fogerty, 40 How. Prac. 492. This general and well-settled rule is not found in any positive enactment. Indeed, none is necessary; it springs from the very nature and necessities of the relation of attorney and client, and finds its highest sanction in the confidential character of that relation. No rule in the ethics of the legal profession is better established nor more rigorously enforced than this one. The relation of attorney and client is one of mutual trust, confidence, and good will. Arrington v. Sneed, 18 Tex. 135. The attorney must use all the care, skill, and diligence at his command on behalf of his client. The relation being, in the highest degree, a confidential one, he is bound to the strictest secrecy and the most scrupulous good faith. He is not allowed to divulge information and secrets imparted to him by his client or acquired during their professional relation, except, perhaps, in very rare circumstances, or when authorized to do so by the client himself. This is the privilege of the client, and not of the attorney, and, unless the client sees fit to waive his privilege, the obligation solemnly rests upon the attorney to keep his lips forever sealed, and to preserve inviolate the confidence reposed in him. The relation may terminate, but the obligation nevertheless continues. In re Cowdery, 69 Cal. 32, 50, 10 Pac. 47, and cases there cited. The duties and obligations of an attorney are aptly and succinctly summed up by Chief Justice Hobart in Herrick v. Catley, 30 How. Prac. 208, as follows: "An attorney oweth to his client fidelity, secrecy, diligence, and skill, and cannot take a reward on the other side." This brief statement of the duties and obligations which an attorney owes to his client demonstrates of itself, if, indeed, any demonstration is necessary, how utterly inconsistent with the proper and faithful discharge of them, and, in fact, totally subversive of them, would be any rule permitting the attorney to occupy a position hostile to his client, or to use against him the knowledge he has confidentially acquired. The authorities are all of one accord on this proposition, and disbarment has invariably been inflicted on the attorney who has violated, or attempted to violate, this rule of professional conduct. In U. S. v. Costen, supra, the facts of a proceeding to disbar were these: An attorney was counsel for the complainant in certain litigation. After acting as such for some time, he ceased to be thus employed, and subsequently offered his services to the other side, and advised its counsel, it seems, through correspondence, that he was in possession of facts of great importance to that side; that he desired employment, but that he wished the fact of his employment concealed. Mr. Justice Brewer, then circuit judge, upon this showing, granted the application for disbarment.

But the respondent contends that his offer of services to Mr. Bates as against the petitioner, his former client, is to be distinguished from the case of U. S. v. Costen, and other cases of a like tenor, on

the ground that the petitioner, in and by the terms of the contract of release executed May 1, 1897, consented that the respondent might take employment against him.    This is the important question in the case, and directly involves, manifestly, the terms, scope, and effect of the contract of release heretofore referred to.    This instrument is as follows:

"This is a contract of mutual release by and between A. B. Bowers and John L. Boone, whereby the said Bowers releases said Boone from all claims, obligations, and services as his attorney in the various suits and actions relating to dredging machines now pending, wherein said Bowers is plaintiff and said Boone is attorney or solicitor.  Said Bowers releases said Boone from all rights, burdens, obligations, and privileges which appertain to his said employment, and consents' that said Boone may engage his services pro or con, as he may see fit.  In consideration of said release the said John L. Boone hereby releases the said A. B. Bowers from all claims, demands, and obligations for services now or heretofore existing.  And it is understood that this mutual release shall apply to all cases now pending, and that the filing of a copy of this agreement in the court where said suits are pending shall be a sufficient evidence of said withdrawal and release."

Upon this contract of release two questions arise:    (1) Its construction, and (2) its validity.    The circumstances under which the contract was drawn up and executed are significant.    They may best be stated in the language of the respondent himself, as the same appears in his testimony:

"Q. (On cross-examination).  Mr. Boone, you drew this contract of release, a copy of which is set forth in your answer, dated May 1, 1897?  A. I did. Q. Did you have any previous consultation with Mr. Bowers prior to drawing that release?  A. Regarding the release?  Q. Yes.  A. None whatever. Q. Did you advise him of its legal results or consequences?  A. I did not. Q. Did you inform Mr. Bowers specifically that, if he executed that release, it was your intent and purpose to seek employment in the action of Bowers v. Bates and Bowers v. Heldmaier and Neu and the other cases then pending in the circuit court for the district of Illinois?  A. I had no talk with Mr. Bowers outside of presenting him with 'the contract.  He read it before he signed it. ·  He knew what he was signing.  Q. Did you prepare it in your own office and send it by messenger to him?  A. I prepared it in my office, and sent it by messenger to Mr. Bowers.  Q. He signed it, and returned one copy of it?  A. Yes, sir.  The Court:  Q. By messenger?  A. Yes, sir.  Q. He did not come to your office?  A. No, sir.  Q. You had no conversation with him about it?  A. Not a word.  Mr. Thornton:  Q. Did Mr. Bowers know, immediately before you sent him and he received a copy of the contract, that you contemplated withdrawing from his case?  A. Not that I know of.  The reason that I sent for him afterwards was because Mr. Delmas and I, talking the matter over, thought it would be well to find out his opinion upon that matter.  The Court:  Q. How did you happen to send that document to him at that particular time?  A. I had made up my mind that as soon as the Von Schmidt Case was finished,—that was the one we were engaged in fighting—  I would wait until the case was entirely finished, and he got his final decree, and there was no question as to my properly getting out of the case at that time.  Q. You knew you could get out of the case at any time?  A. I did not care to desert a man while he was under fire.  I wanted him to get out clear first.  I did not propose to desert him while his patent was in danger.  I made up my mind to wait until after the litigation was through with.  Q. You had no talk with him about that?  A. No talk with him whatever."

From this testimony one thing is plain, and that is that the respondent was grossly remiss in his duty as an attorney in not advising the petitioner as to the exact terms of the contract of release,

and the consequences that might flow from it. It was his bounden duty to give him "all reasonable advice against himself that he would have given him against a third person." Gibson v. Jeyes, 6 Ves. 278; Valentine v. Stewart, 15 Cal. 387; Felton v. Le Breton, 92 Cal. 457, 28 Pac. 490; Cox v. Delmas, 99 Cal. 104, 33 Pac. 836. He admits that he failed completely to do so. He had no right to assume, as is strenuously contended for by his counsel, that the petitioner's familiarity and long experience with litigation were sufficient to enable the latter to pass an intelligent and discriminating judgment on the precise nature and legal effect of the release, or that the petitioner would procure the advice of some other attorney. It was his duty to see to it that the petitioner actually understood and fully appreciated the precise nature and full scope of the document in question. Not having done so, the petitioner cannot be deemed bound by it. It is incredible that the petitioner, had the full scope and probable consequences of the contract of release been explained to him by the respondent, would have consented to it. According to the terms of the release, as contended for by his counsel, the respondent had the right to take employment against the petitioner in the case of Bowers against Bates, and to use the knowledge he had confidentially acquired from the petitioner, while acting as his attorney, in the cross-examination of witnesses and the conduct generally of the case. But the contract is not expressed in these plain words. The nearest approach to it is the following stipulation:

"Said Bowers releases said Boone from all rights, burdens, obligations, and privileges which appertain to his said employment, and consents that said Boone may engage his services pro and con, as he may see fit."

There is certainly nothing in this stipulation, nor in the release, taken as a whole, which states explicitly that Mr. Bowers consented that Mr. Boone should take employment in the suit of Bowers against Bates, nor, in fact, in any case in which Mr. Bowers had appeared as plaintiff, which involved the validity of the patents for which Mr. Boone, in other cases, while acting as his attorney, had litigated; nor is there anything in the entire release which says, in so many words, that Mr. Bowers consented that Mr. Boone should use the knowledge he had confidentially acquired from Mr. Bowers, while acting as his attorney, in the cross-examination of witnesses, or against him in any way. On the contrary, the stipulation is not wholly inconsistent with the interpretation that Mr. Bowers considered that he was merely releasing Mr. Boone from the relation of attorney and client that had theretofore existed between them, and that this termination of their relation, as such, was simply couched in apt legal verbiage. And that part of the stipulation which "consents that said Boone may engage his services pro or con, as he may see fit," is not inconsistent, in the absence of any more definite stipulation, with the idea that it was intended to apply to employments entirely outside of and foreign to Bowers' patents with reference to which Boone had rendered professional services to Bowers. In a case like this, every presumption is in favor of the petitioner and against the respondent, and every doubt must be resolved in favor

of the petitioner. The circumstances under which the release was executed certainly invite the application of such a rule of interpretation. It is inconceivable that the petitioner, having established the validity of his inventions and patents after so much litigation, in which the respondent, as his attorney, had for at least seven years actively participated, would be willing that the latter should use knowledge of the inventions and patents, derived from their professional relations, in behalf of a party who was directly interested in defeating the petitioner's patents. To the petitioner, the ultimate result and successful issue of the litigation affecting his inventions and patents for dredging, and in which he was then engaged, meant his reputation and fame as an inventor, aside from the large financial profits to accrue. That he would thus willingly and freely consent, apparently without the slightest objection or hesitancy, to furnish his adversaries in this very same litigation with weapons with which to contest, and, possibly, defeat, his valuable rights as an inventor and patentee, is, as before stated, almost unworthy of credence. The court will not assist an interpretation that would lead to that result by any presumptions in its favor. Language in a contract of release, such as that introduced in the matter at hand, to justify any such interpretation, would have to be positive, unequivocal, and inconsistent with any other interpretation. Ordinary experience teaches us that men endowed with the ordinary business sense and experience do not enter into such remarkable and prejudicial engagements. While I am of the opinion that the petitioner is not bound by the contract of release, considering the circumstances under which it was executed, still, as the argument at the bar proceeded into the broader channel as to whether or not the release was valid, I prefer to place my decision upon that ground.

Assuming, therefore, for the purposes of the decision, that the petitioner did fully understand the nature, scope, effect, and probable consequences of the contract of release, does it follow that this court will give effect to and recognize such contract as valid, and as affording a justification to the respondent for the acts of unprofessional conduct complained of? The contract of release purports to contain a complete absolution by Bowers, as client, to Boone, as attorney, from all the rights, burdens, obligations, and privileges incident to his employment by Bowers, and an unqualified consent by Bowers that Boone might take employment against Bowers. In other words, the petitioner consented that the respondent, his former attorney, might be employed against him in the very litigation which affected the validity of his patents; that the respondent, being released from all the duties, burdens, obligations, and privileges that appertained to his employment as attorney, was free to divulge knowledge acquired during his professional relation with the petitioner, or to use it against him, if he saw fit. In brief, it would seem as if the petitioner had consented that the respondent, as attorney, might violate with impunity any of the obligations which the law imposes upon the relation of attorney and client. This interpretation may seem as exaggerated as it is startling, but neverthe-

less it is the inevitable result to which the words employed in the release lead us, if we are to accept any interpretation other than that the contract was intended as a mere release of legal services, and to place on record the fact of the termination of the relation of attorney and client. The gross improbability that the petitioner fully understood and appreciated what he really was consenting to, in view of the admitted fact that not one word of explanation or advice about the terms of the release was given him by the respondent, for whose benefit, obviously, the release was given, has already been commented on. But, aside from that, a client cannot consent that an attorney should be released from obligations which the law imposes upon him. A client may waive a privilege which the relation of attorney and client confers upon him, but he cannot enter into an agreement whereby he consents that the attorney may be released from all the duties, burdens, obligations, and privileges pertaining to the relation of attorney and client. I have been referred to no case, nor have my researches been rewarded with the discovery of any authority dealing with a release or contract between attorney and client by which the latter consents to release the attorney from all the duties, burdens, obligations, and privileges peculiar to the relation. I only refer to this fact, not as indicating that I experience any difficulty in determining the invalidity of the release in question, but as tending to show that no such instrument has probably ever before been submitted for judicial scrutiny. In determining that the present contract of release is void, I am guided by reasons of public policy, and by considerations which relate to the due and orderly administration of justice, to the honor and purity of the profession, to the protection of clients, and to the dignity of the court itself. Keeping these considerations in mind, I am firmly of the opinion that a contract, or waiver, or release, or consent, or by whatever name it may be styled, by which it is sought to release an attorney from all the duties, burdens, obligations, and privileges incident to the relation, is totally inoperative and void, and contrary to public policy. It is violative of every principle of professional honor and integrity. It is absolutely inconsistent with the duties, burdens, and obligations which an attorney assumes when he enters into the relation of attorney and client, and, in fact, is subversive of them. To uphold such a release as valid and effectual would be fraught with the most pernicious consequences both to the public and to the profession. It would give rise to most unscrupulous and unprofessional practices, and the rankest frauds could be perpetrated upon unsuspecting and improvident clients, and, perhaps, on the courts themselves. A client, in poor circumstances, could be imposed upon by a rich adversary. The inevitable result of such a doctrine would be to degrade the profession and bring the courts themselves into disrepute. The fact that a client may be willing to enter into such a contract does not justify the court in upholding it, nor can the client's consent or connivance shelter an attorney from unprofessional conduct. Courts owe a duty to themselves, to the public, and to the profession which the temerity or improvidence of clients cannot supersede.

But it is further contended by counsel for respondent that a client may permit his attorney to divulge information acquired during their professional relation, and that the release was valid and operative for this purpose. Undoubtedly it is the law that, as the observance of confidence and secrecy by an attorney is the privilege of the client, the latter may waive the privilege, and consent that the attorney disclose certain information. But such a waiver must be distinct and unconditional. Tate v. Tate, 75 Va. 522. The release in this case is absolutely devoid of distinctness and certainty on this point. It purports to release the respondent from all of the "rights, burdens, obligations, and privileges" appertaining to his employment as attorney for the petitioner. This is too indefinite; besides, it is entirely prospective. It fails to specify when, or to whom, or where, or what particular information of a privileged nature is to be disclosed. Even if it were more clearly expressed, still a contract, entered into between client and attorney, for the purpose of binding the former, that the latter may at any time divulge information or knowledge acquired during the professional relation, is not a good waiver of the privilege, and is void. The client cannot be held bound by any such compact. The privilege was intended for his benefit, and not for that of his attorney. It was intended to be exercised by him freely and whenever the contingency presented itself with the consequences immediately before him. In the present case, if the contract is binding and he subsequently desired to retract his waiver of the privilege, he could not do so. By its terms he would be foreclosed from ever objecting to any professional disclosure the respondent might see fit to make. A privilege or exemption or immunity would cease to be such, and would be rendered useless, if it could be bartered away in that manner. It would be of no benefit to those improvident and misguided persons for whose benefit it was chiefly intended. Kneettle v. Newcomb, 22 N. Y. 249. In that case the reasons upon which the incapacity of parties to contract away their privileges is based are clearly stated. It appeared that the plaintiff had contracted to waive and relinquish all right of exemption of any property he might have from execution on certain debts incurred. This stipulation was contained on several notes upon which plaintiff, in a previous action, had been sued, and as to which judgment had been rendered against him. Execution was issued on that judgment, and the deputy sheriff seized and sold the plaintiff's household furniture and his tools, which were exempt from execution by law. The plaintiff forbade the taking and selling of the property referred to, claiming that they were exempt, by law, from execution, and thereafter brought the case cited to recover for the taking and conversion. The court below had given judgment in favor of the plaintiff, holding that the defendants were not warranted in seizing and selling the exempt property. The court of appeals affirmed this judgment, and Denio, J., in delivering the opinion, used the following clear language:

"The statutes which allow a debtor, being a householder and having a family for which he provides, to retain, as against the legal remedies of his creditors, certain articles of prime necessity, to a limited amount, are based upon

views of policy and humanity which would be frustrated if an agreement like that contained in these notes, entered into in connection with the principal contract, could be sustained. * * * The law was designed to protect him against his own improvidence in giving such consent. The statutes contain many examples of legislation based upon the same motives. The laws against usury, those which forbid imprisonment for debt, and those which allow a redemption after the sale of land on execution, are of this class. So of the principle originally introduced in courts of equity, and which has been long established in all courts, to the effect that, if one convey land as security for a debt, and agree that his deed shall become absolute if payment is not made by the day, he shall still be entitled to redeem on paying the debt and interest; and so, also, with executory contracts without consideration to make gifts, and the like. In these cases the law seeks to mitigate the consequence of men's thoughtlessness and improvidence, and it does not, I think, allow its policy to be evaded by any language which may be inserted in the contract  It is not always equally careful to shield persons from those acts which, instead of being promissory in their character and prospective in their operation, take effect immediately. One may turn out his last cow on execution, or may release an equity of redemption, and he will be bound by the act. In thus discriminating, the law takes notice of the readiness with which sanguine and incautious men will make improvident contracts which look to the future for their consummation, when, if the results were to be presently realized, they would not enter into them at all. If, with the consequences immediately before them, they will do the act, they will not generally be allowed to retract; it being supposed, in such cases, that valid reasons for the transaction may have existed, and that, at all events, the party was not under the influence of the illusion which distance of time creates. Ordinarily, men are held to their executory as well as their executed contracts; but in a few exceptional cases, where the temptation is great or the consequences peculiarly inconvenient, parties are not allowed to make valid prospective agreements."

This language is peculiarly applicable to the contention that the release was valid as a waiver of the privilege of confidence and secrecy on the part of the respondent. The respondent himself appears to have regarded the contract of release inoperative as a legal waiver, for, during his testimony, he sought to purge himself of any unprofessional conduct, by disclaiming that, had he been employed by Mr. Bates, he intended to disclose any knowledge he had acquired from the petitioner during the course of their professional relation, but that he simply proposed to use this knowledge in the cross-examination of witnesses. But it seems very doubtful whether the respondent could have carried out this plan, and yet expect to be employed. It is difficult to understand how he hoped to obtain employment unless he disclosed to Mr. Bates, or to his attorney, Mr. Banning, the nature and particulars of the information which he claimed would show that the decree in the Von Schmidt Case had been fraudulently obtained. It is very doubtful whether either Mr. Bates or Mr. Banning would have accepted the respondent's mere pretense that he possessed important information of the character indicated, and would have rested content with the general statement that he had the information, without obtaining further particulars, so that they might judge of the value, to them, of the alleged information. But, as the respondent has purged himself on this point, his explanation perhaps concludes the court with respect to that feature of this matter. In so far, however, as he proposed to use the knowledge or information which he had gained

from his professional relations with Mr. Bowers in the examination of witnesses, his conduct was certainly unprofessional, and, viewed under the most extenuating circumstances, cannot be condoned. It was an act of disloyalty and infidelity to his client, and a breach of the obligation he owed. The proposed use of information, which an attorney has gained confidentially from his client, in cross examining witnesses for a party who occupies a position necessarily hostile to the interest which the attorney at one time was employed to protect and champion, is just as serious a violation of the obligation to keep inviolate his client's secrets as if the attorney actually divulged the privileged information to his client's adversary. It is a powerful weapon in the hands of an adversary, and may prove most prejudicial to the interests of his former client. No more convincing reason why an attorney should not be permitted to take a position hostile to his client can be urged than the above. The fact that the case in which the respondent proffered his services was not one of the cases in which he had been employed by, and had rendered services to, the petitioner, can make no material difference in the application of the rule. The case of Bowers against Bates involved the same patents at issue in Bowers against Von Schmidt and Bowers against the San Francisco Bridge Company, in both of which cases the respondent had represented the petitioner. This fact presents an insuperable objection, in law as well as in morals, to the respondent acting as attorney for any party or parties whose interests, as in the case of Bowers against Bates, were bound to be hostile to those of the petitioner. Although the application of the rule generally arises where an attorney offers and renders services to his client's adversary in the same suit, still cases may arise, and the present one is an instructive example, where an attorney would be equally false to the obligations of secrecy and fidelity he owes a former client, and could perpetrate as much mischief in rendering professional services against such former client.

It is contended, finally, that the information or knowledge which the respondent referred to in his letter to Mr. Banning, and which he proposed to use in the examination of witnesses as against Bowers, if employed in the case of Bowers against Bates, was not protected as privileged matter, because it related to a fraud perpetrated upon this court in obtaining the decree in the Von Schmidt Case. Undoubtedly it is the rule that the disclosures made by a client to his attorney involving crimes malum in se, or, as in the matter at hand, the prostitution of justice itself, are not protected by the privilege. Bank v. Mersereau, 3 Barb. Ch. 528; 19 Am. & Eng. Enc. Law, p. 140, and cases there cited. It, therefore, becomes necessary to inquire into this alleged fraudulent transaction. In his testimony before the court the respondent explained what he meant by the statement contained in his letter, as follows:

"In either the year 1891 or 1892—I cannot fix the exact date—Mr. Bowers and myself were one day in the office of the master in chancery of this court, in the small room which I now believe is occupied by Judge Morrow as a part of his office. The models in the Bowers Case were all there. We had been examining the models. At the particular time to which I refer I was

seated at the table in the room, and Mr. Bowers was two or three feet to my left, away from me, sitting with this model in his hand. Q. Please to identify it. A. The exhibit is torn off. Mr. McPike: Q. Let me interpose. Do you say this model, or a fac simile? A. No; I do not think it was this model, because it had a leather suction-pipe connection. Here it is. I cannot say whether it is the identical model. It was either the identical model or a similar one. It represented the same model. He was handling the model. I was paying no attention to what was going on. I heard something fall on the floor. I looked around, and I saw a piece of tin of which this is a sample (producing) lying on the floor, fallen in front. As I looked around, Mr. Bowers looked at me, reached over, and picked it up. He said, 'That is all right; we will say nothing about it;' and put it in his pocket. It was not done hurriedly, but very deliberately, as Mr. Bowers always is. We then together took this model. I took it, turned it over, looked at it, and— Now, I say this is the first time since that incident occurred that I have had this model in my hand, and the first time I have put my eyes on it, to my knowledge. I have never gone to the court room to look at this model in any way, shape, or manner. I looked in the cutter. I looked to see if I could find how the piece which had fallen out had been attached, because I saw at once it was the inner cylinder of that excavator. I thought I perceived a line of rotten solder which had attached that to the head of the cutter. Q. Of the suction pipe, you mean? A. The head of the cutter. It formed an extension of the suction pipe extending into the excavator. Q. Is that the part which is referred to in the brief? Mr. Thornton: Whose brief? Mr. McPike: Q. The brief prepared by Mr. Miller, at page 12. The words in italics at the top of page 12: 'As this inner cylinder does not rotate, it is no part of the rotary excavator.' A. That is the part. The Court: Q. Is it that cylinder there (pointing)? A. It was inside. How it came out, I do not know. I did not see it come out. I know it fell on the floor. Mr. McPike: Q. Take that part, and see if you can adjust it. Mr. Thornton: Can you take this apart, Mr. Bowers? The Court: Let me see about this (addressing the witness). Was this the condition in which the exhibit was? A. So far as I can now judge. Q. Is this piece of metal now absent from that? A. It is now absent. Q. It once was in there? A. Undoubtedly."

The model referred to is known as "Model N," and was offered in evidence in the case of Bowers against Von Schmidt, on behalf of Bowers, the plaintiff, on October 28, 1890. This was prior to the alleged act of mutilation. While the respondent cannot fix exactly the date of the occurrence in the master in chancery's room, his testimony shows that it was after January 7, 1891, and prior to October, 1892, because in the month of October, 1892, he took the stand in the case of Bowers against the San Francisco Bridge Company, and testified as a witness in behalf of his client, Bowers, with reference to the condition of this same model. The petitioner denies absolutely that anything of the kind attributed to him by the respondent ever took place. Mr. John H. Miller, his present attorney, took the stand, and testified that he had had occasion to examine this same model very many times; that he was thoroughly familiar with it; that it never had, nor was it ever intended to have, an inner cylinder; that it was in the same condition, with the exception that the rubber suction pipe had been broken off from constant handling, it was in when he first saw it, some time in 1889, when he came into the case. There is therefore an irreconcilable conflict between these parties on this point. It is a fact of significance that the respondent testified as a witness on behalf of the petitioner in the case of Bowers against the San Francisco Bridge Company that the exhibit, which he now says was mutilated by Bowers, was in the same condition as it had always

been.   This testimony was given after the alleged act of mutilation in the master of chancery's room had occurred.   He testified as follows:

"Q. Are the various models which you say you saw—these various models—in exactly the same condition now that they were at the time they were shown to you?   A. Substantially, I think.   I don't recognize any change, particularly."

Under this state of facts, I am led to the inevitable conclusion that the respondent is guilty of one of two things,—either he testified falsely, and misled the court, in his testimony given to the court and jury in the case of Bowers against the San Francisco Bridge Company, or else the statement in his letter to Mr. Banning that the decree in the Von Schmidt Case had been fraudulently obtained was a falsehood and a pure fabrication of his mind, made with the evident purpose of throwing discredit on his former client's decree, to impair its value as a precedent and authority, and also to insure his employment by Mr. Bates.   He now explains his testimony, given in the case referred to, by stating that he testified that the model was "substantially" in the same condition; that he did not say it was exactly in the same condition.   But the court can hardly accept this technical differentiation in his testimony to shield him from the full purport and meaning of his sworn statements.   The impression gained from the use of the word "substantially," to the ordinary mind, is that there is no material change; whereas the respondent, in his letter and from his present testimony, would have the court believe that the change in the condition of the model was so substantial that it was important and material enough to reverse the decree rendered in the Von Schmidt Case.   He claims, further, that he felt under no obligation to amplify or enlarge or explain his testimony because he was then the attorney for the petitioner, and that he considered that he had no right to divulge voluntarily his client's alleged perfidy and misfeasance.   The obligation of an attorney to remain faithful to his client, and to keep inviolate his client's professional communications or knowledge, gained therefrom, while, undoubtedly, going very far in justifying him from making disclosures, still was never understood or intended to justify an attorney in misleading the court itself. While a lawyer may remain passive as to many things which his client reveals to him professionally, still he cannot actively participate and assist his client in perpetrating a fraud on the court.   The profession of an attorney, and the obligations he assumes, are intended for the furtherance of justice, not its perversion.   But, aside from the moral persuasion that the respondent was under to testify, not only to the truth, but to the whole truth, and nothing but the truth, he was in duty bound, as a matter of law, to state the whole truth.   Where an attorney is offered as a witness by his client, he cannot claim his privilege on cross-examination.   Crittenden v. Strother, 2 Cranch, C. C. 464, Fed. Cas. No. 3,394; Vaillant v. Dodemead, 2 Atk. 524.   While an attorney may be justified in declining to testify on the ground that he would be disclosing professional secrets, still when he does testify he is not justified in perverting the truth to protect his client.   If he testifies at all, he must testify fully

**and truly.** When the petitioner offered the respondent as his witness, he impliedly waived his privilege, and the respondent was morally and legally bound to speak the truth, just as much so as if the petitioner himself had testified to the facts he sought to prove by the respondent as his attorney. While it is true that the respondent is not on trial, in this proceeding to disbar, for the crime of perjury, still his conduct in testifying as he did is subject to the cognizance of the court, affecting, as it does, the integrity of proceedings that have taken place in this court. If the court is satisfied that the respondent did not testify fully and truly, a conviction for perjury is not a necessary prerequisite to disbarment. Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569. If, however, the court should take the other alternative, viz. that the respondent testified truly, but that he grossly misrepresented matters in his letter to Mr. Banning, the result is equally unfortunate for the respondent. It does not become an attorney to cast false reflections upon proceedings in court to the prejudice of his former client's interests, nor to deprive him of the well-earned fruits of a long, arduous, and difficult litigation. Such conduct is certainly unprofessional, and, in my opinion, reprehensible in the extreme. In my judgment, the respondent's testimony given in court in the case of Bowers against the San Francisco Bridge Company must be accepted as true, and his representations in the letter to Mr. Banning and his testimony in the present proceeding as untrue. His own testimony, given in the case of Bowers against the San Francisco Bridge Company, is self-impeaching, and casts discredit on his present testimony. It is absolutely contradicted by the petitioner and by Mr. Miller. I am compelled to accept their version as against that of the respondent, and to believe that the statement in respondent's letter to Mr. Banning, that the decree in the Von Schmidt Case had been fraudulently obtained, was not true, and was made with the purpose of casting discredit on that decree, thereby impairing its value as a precedent and authority; also that it was made with the end in view of obtaining employment as against his former client, the petitioner, and, if successful, of using the knowledge he had acquired confidentially against him. A lawyer who will resort to such practice cannot be deemed a fit member of the profession.

In extenuation of the conduct of the respondent, it is claimed that he was acting in good faith, and really believed that the terms of the release were sufficient to justify him in offering his services to Mr. Bates, and, if employed, to use the knowledge he had acquired confidentially from the petitioner, while acting as his attorney, against him in cross-examining witnesses and the conduct of the case generally, and that he was re-enforced in this view by eminent professional advice, as to which he testified. This advice appears, from his own testimony, to have been sought for and obtained after the release had been drawn up and executed,—a fact which does not commend itself to the claim of good faith so earnestly pressed by his counsel. The mere fact that he supposed that, from a legal standpoint, he was protected in the course he proposed to pursue, does not supply nor justify the entire absence of good faith and fidelity which his conduct towards the petitioner makes so conspicuous. The claim

that he was acting under professional advice cannot shield him from the consequences of his acts of unprofessional conduct. Considering the testimony as a whole, it is difficult to escape the conclusion that the respondent was seeking to betray the interests of his former client, the petitioner.

With reference to the second charge, that the respondent attempted to extort money from the petitioner through his representative, one H. S. Saleno, the testimony between the respondent and the latter is irreconcilably conflicting, and, in the view I take of the first charge, it is unnecessary to consider it.

I have considered this matter very carefully, and have given it a great deal of reflection. It is an unpleasant duty to perform, particularly of an attorney who has been an experienced and successful member of the bar and of this court; but in the view I take of the testimony, coupled with the respondent's own admissions while on the stand, I can come to no other conclusion but that the respondent has been clearly proven guilty of such unprofessional conduct as calls for disbarment. In concluding this already lengthy opinion, I can do no better than quote the felicitous language of Mr. Justice Brewer, then circuit judge, in U. S. v. Costen, supra, as follows:

"It is the glory of our profession that its fidelity to its client can be depended on; that a man may safely go to a lawyer and converse with him upon his rights, or supposed rights, in any litigation, with the absolute assurance that that lawyer's tongue is tied from ever disclosing it; and any lawyer who proves false to such an obligation, and betrays, or seeks to betray, any information or any facts that he has attained while employed on the one side, is guilty of the grossest breach of trust. I can' tolerate a great many things that a lawyer may do,—things that, in and of themselves, may perhaps be criticised or condemned,—when done in obedience to the interest or supposed interest of his own client, and when he is seeking simply to protect and uphold those interests. If he goes beyond, perhaps, the limits of propriety. I can tolerate and pass that by; but I cannot tolerate for a moment, neither can the profession, neither can the community, any disloyalty on the part of a lawyer to his client. In all things he must be true to that trust, or, failing it, he must leave the profession."

The application for disbarment upon the first charge made will be granted, and the respondent will stand disbarred, and his name will be stricken from the roll of attorneys and counselors of this court; and it is so ordered.