279 F.2d 623
 95 A.L.R.2d 303, 60-2 USTC P 9527
 Alva C. BAIRD, Appellant,
v.
Laurence P. KOERNER, Special Agent, Internal Revenue
Service, Appellee.
Laurence P. KOERNER, Special Agent, Internal Revenue
Service, Cross-Appellant,
v.
Alva C. BAIRD, Cross-Appellee.
 No. 16495.
 United States Court of Appeals Ninth Circuit.
 June 6, 1960, Rehearing Denied Aug. 1, 1960.
 
 Baird & Holley, Thomas A. Baird, B. H. Neblett, Albert J. Galen, Los Angeles, Cal., for appellant.
 Laughlin E. Waters, U.S. Atty., Edward R. McHale, Asst. U.S. Atty., Los Angeles, Cal., for appellee.
 Before STEPHENS, BARNES and JERTBERG, Circuit Judges.
 BARNES, Circuit Judge.
 
 
 1
 Appellee, as Special Agent of the United States Internal Revenue Service, sought by his petition the aid of the district court (28 U.S.C. 1340, 1345) to enforce a summons and compel testimony (26 U.S.C. 7402) at an inquiry as to the identity of a person who might be liable to pay an internal revenue tax (26 U.S.C. 7601-7605). He received such aid. The district court ordered appellant Alva C. Baird to answer a certain question. Baird refused to answer.
 
 
 2
 This is an appeal from a judgment of civil contempt and an order committing Baird to custody because of his refusal to answer that question (as to the identity of his clients), and a cross-appeal from that portion of the judgment which does not require appellant Baird to answer other questions with respect to the identity of other attorneys and accountants for said clients.[1]
 
 
 3
 Specifically, appellant was asked, and refused to answer, as to the 'identity and addresses of each and every person who employed appellant in connection with his transmittal of a cashier's check in the sum of $12,706.85 to the Director of Internal Revenue at Baltimore, Md.' Appellant based his refusal on various grounds, but primarily on the privilege existing between attorney and client. As government counsel stated in oral argument, the one real issue is: Is there here a valid claim of the attorney-client privilege?
 
 I. Factual Background
 
 4
 The judgment and commitment below arose out of the following facts. Appellee is Laurence P. Koerner, Special Agent of the Internal Revenue Service. Appellant is an attorney at law, and has been engaged in the practice of law continuously from April 20, 1920. He is admitted to practice before all of the state courts of California and Montana, the Tax Court of the United States, the United States Court of Claims, the District Courts of the United States in California and Montana, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States.
 
 
 5
 From September 8, 1925 to June 30, 1943, appellant was engaged as an attorney in the Internal Revenue Service of the United States and for a substantial portion of that time was engaged in handling cases involving tax frauds and criminal prosecutions. For five years before his resignation from the Service in 1943, appellant was Division (now Regional) Counsel of the Pacific Division of the Internal Revenue Service, which included the nine Western States and the Territory of Hawaii. At all times since June 30, 1943 appellant has been regularly authorized to practice in all matters before the Treasury Department of the United States. Since June 30, 1943 appellant has been, and now is, engaged in the practice of law in the State of California with offices at Los Angeles, California, and a substantial portion of his practice is devoted to all phases of State and Federal Tax Laws, including the representation taxpayers accused of fraud or charged with alleged criminal violations of the Internal Revenue Laws.
 
 
 6
 Early in August 1956 appellant consulted with certain accountants and gave advice concerning certain undisclosed taxpayers' income tax. There was a discussion of defenses and steps to be taken to place the undisclosed taxpayers in the most favorable position in the event criminal charges were to be brought against them by the Internal Revenue Service.
 
 
 7
 The accountants determined the undisclosed taxpayers' returns were incorrect and the taxes understated. No investigation was then being made, nor had it been made by the government, of taxpayers.
 
 
 8
 On or about the middle of August 1956 taxpayers' attorney came to appellant's office in Los Angeles and discussed with him in detail the facts and circumstances of the case. After a complete and thorough discussion of procedural steps, and of the moral, legal and tactical advantages of making payment of the tax then due, but without disclosing the identity of the taxpayers, their said attorney delivered to appellant the sum of $12,706.85, which had previously been determined to be the amount of the tax due, with interest thereon to September 1, 1956. The taxpayers' general attorney also, as compensation for the consultation and advice given in the various conferences had in regard to the matter, paid appellant a fee commensurate with the value of the services rendered.
 
 
 9
 On August 20, 1956 appellant transmitted a cashier's check dated August 17, 1956 for $12,706.85 to the District Director of Internal Revenue at Baltimore Maryland, with a letter reading as follows:
 
 
 10
 'August 20, 1956
 
 
 11
 'Mr. Clarence L. Fox, Jr.
 
 
 12
 District Director of Internal Revenue Custom House
 
 Baltimore 2, Maryland
 
 13
 'Sir:
 
 
 14
 'There is enclosed Cashiers Check of Citizens National Trust & Savings Bank of Los Angeles No. 241292, dated August 17, 1956, payable to Director of Internal Revenue in the amount of $12,706.85.
 
 
 15
 'This represents additional amounts due from one or more taxpayers for some past years. Their names have not been disclosed to me. However, I am informed that the aggregate additional amount, together with interest computed to September 1, 1956, is the amount of the check, $12,706.85.
 
 
 16
 'No investigation of any kind is now in process by the Internal Revenue Service. There seems to be no reason to believe that one will be promulgated in the future. However, the attorney representing this group concluded that there were additional taxes due the United States and recommended to his clients that payment be made. The amount transmitted may be deposited in the Deposit Fund Account of the Treasurer of the United States of in such other account as may be appropriate for unidentified collections.
 
 
 17
 'Yours Respectfully, (s) Alva C. Baird Alva C. Baird
 
 
 18
 'ACB;eg Enclosure'
 
 
 19
 The record shows that the identity of the texpayers in question, their names and addresses have never been disclosed to appellant. Appellant was advised, however, that the taxpayers are reputable and responsible business men who are now and have always been engaged in a legitimate business, and have not engaged in any unsavory or illegal businesses of any kind.
 
 
 20
 On November 27, 1957, appellee, as Special Agent, issued a departmental summons, requiring appellant to identify the attorneys, the accountants, and the taxpayers for whom the check was forwarded. On December 16, 1957 appellant appeared in answer to the subpoena, was sworn, and declined to name the taxpayers on the ground he did not know their names, and declined to name the accountants or attorney on the ground that such information came to him as a privileged communication from the unknown client to Baird, as an attorney.
 
 
 21
 Appellee then filed a petition for enforcement of the Internal Revenue Service summons, and an order to show cause. Appellant moved to dismiss and to quash. These motions were denied. Appellant then answered the petition and order to show cause, pleading as defenses: (1) that no cause of action was stated; (2) the attorney-client privilege; (3) the fifth amendment, and Article I, Section 13 of the California Constitution; and (4) the fourth amendment, and Article I, Section 19 of the California Constitution.
 
 
 22
 At the hearing of the order to show cause in the district court, appellant refused to answer questions as to the identity and address of his employers and was found guilty of civil contempt. He was committed to custody until he was willing to answer, and a stay was granted to permit this appeal.
 
 II. The Attorney-Client Privilege
 
 23
 We must first consider what the attorney-client privilege is; whether it here exists; to what does it extend; must it be raised, and if so, how; and who is entitled, or required, to raise it?
 
 
 24
 In considering these questions, we first run into divergent views as to what body of law applies-- state or federal? Appellant Baird assumes in his opening brief that the law of the forum state applies. Appellee Koerner states there exists a federal common law fule that is applicable.
 
 
 25
 There is no question but that in diversity cases, the rule of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, requires the federal courts to ascertain and follow what the state law is if the state decisions are sufficiently conclusive, definite and final. But the Erie rule excepts 'matters governed by the Federal Constitution or by Acts of Congress.'
 
 
 26
 The taxing authority of the federal government lies in the Constitution, Article I, Section 8, and that same section authorizes Congress to make all laws necessary and proper to execute and implement this power. Congress has enacted the Internal Revenue Code under which appellee has acted.
 
 
 27
 While the authority under which the proceedings below were instituted stems from congressional enactment, that does not mean that there exists a federal common law defining the nature and extent of the privilege between attorney and client. There cannot be an attorney-clinet privilege unless the party to whom the communication was made is an attorney. United States v. United Shoe Machinery Corporation, D.C.Mass.1950, 89 F.Supp. 357-358. Each state determines, within constitutional limitations, who may or may not practice law within its courts. Schware v. Board of Bar Examiners, 1957,353 U.S. 232, 248, 77 S.Ct. 752, 1 L.Ed.2d 796 (concurring opinion, Frankfurter, J.). The federal courts establish their own rules as to the requirements of those practicing before them. The Supreme Court requires in addition to good private and professional character that one should have been admitted for three years to the highest court of any state, territory, etc. Rules of the Supreme Court of the United States Rule 5, 28 U.S.C.Appendix. This Circuit admits those of good moral character and a professional standing, admitted to the highest court of any state, the Supreme Court of the United States, or any District Court of this Circuit. Rules of the Ninth Circuit Court of Appeals, Rule 7, 28 U.S.C.
 
 
 28
 The rules of the District Court for the Northern District of California (for an example) state that any member of the Bar of the State of California is eligible for admission. Rule 1. The rules of the District Court for the Southern District of California require a showing that the applicant is an active member of The State Bar of California.[2]
 
 
 29
 We need not consider the rules of other federal districts and circuits to conclude that the decision as to who may practice law is a matter primarily for determination by each state within such district or circuit.
 
 
 30
 And because the attorney is created by state law, and differs from state to state, so the nature and extent of the privilege that exists between attorney and client varies. We find in Corpus Juris Secundum, 35 C.J.S. Federal Courts 131(b), the general statement:
 
 
 31
 'On the question of privileged communications, the federal courts follow the law of the state of the forum.'
 
 
 32
 And in Munzer v. Swedish American Line, D.C.S.D.N.Y.1940, 35 F.Supp. 493, the same rule is announced (there, with respect to the privilege of a patient and his communication to a doctor) in a proceeding to set aside subpoenas duces tecum issued under Federal Rules of Civil Procedure 45(d)(1), 28 U.S.C. The privilege relied upon was created by state statute, Section 352 of the New York Civil Practice Act. Judge Leibell, in support of this rule, cites five cases[3] all or which relate to the physician-patient privilege. They appear to be based on diversity of citizenship, but are persuasive of the present problem.
 
 
 33
 This is a civil case. Under Rule 43(a) of the Federal Rules of Civil Procedure the competency of a witness to testify is determined in like manner as the competency of evidence. All evidence is admissible which is admissible under federal statutes, under the rules previously applied by federal courts in suits in equity, or under the rules of evidence applied in the forum state. We have been cited to no federal statute or rule purporting to set up federal rules governing privilege in civil cases. Under the rules previously applied by federal courts in suits in equity, it has been stated by text-writers that state statutes were followed. Moore's Federal Practice 43.07 (2d Ed. 1951); cf.: I Wigmore on Evidence 6 (3rd Ed. 1940). Thus, in civil cases, the strong inference exists that the law of the forum state has generally been, and should be, applied. Cf. Anderson v. Benson, D.C.Neb. 1953, 117 F.Supp. 765, 772; I Wigmore on Evidence 6(c) (3rd Ed. 1940).
 
 
 34
 We likewise find criminal cases brought under federal statutes where the law of the forum was applied with respect to privilege. In United States v. Pape, 2 Cir., 1944, 144 F.2d 778, the defendant was accused of violating the White Slave Traffic Act, 2 (18 U.S.C. 2421). After first excluding testimony alleged to have been privileged, the trial court on the authority of a New York State case (People ex. rel. Vogelstein v. Warden of County Jail, 1934, 150 Misc. 714, 270 N.Y.S. 362, affirmed without opinion, App.Div., 271 N.Y.S. 1059) ruled the testimony not privileged. On one of the very issues in the instant case (whether the fact of employment, rather than any communication between the client and the attorney is privileged) the second circuit affirmed the court below, relying on People v. Warden of County Jail, supra, as well as federal cases that will be hereafter discussed.[4]
 
 
 35
 In Ex parte Sparrow, D.C.N.D.Ala., 1953, 14 F.R.D. 351, the question of privilege of a newspaper reporter arose. A libel suit was pending in the United States District Court for the Southern District of New York. Plaintiff proceeded under Rule 30 of the Federal Rules of Civil Procedure to take Sparrow's deposition in Alabama. During the taking of his deposition, the witness refused to answer questions as to the source of his information, claiming privilege. It was conceded that the sources of information given to a journalist are not privileged under the laws of New York.[5] The court ruled that the depositions were governed by the provisions of Rule 26(b) of the Federal Rules of Civil Procedure, and therefore the witness could be asked only about matters 'not privileged.' When he refused to answer, by Rule 37(a) of the Federal Rules of Civil Procedure, the moving party was ruquired to apply 'to the court in the district where the deposition is taken' for an order compelling an answer. The court then said:
 
 
 36
 'While this court does not consider the question of privilege to be a matter of substance and therefore controlled by Erie R. Co., v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, it would appear that this court should refer to the statutory law of Alabama in the absence of any Federal rule on privilege.'[6]
 
 
 37
 The judge then noted the Alabama statute 'clearly' made such information privileged, ruled he was 'not bound to apply the Alabama law in interpreting the words 'not privileged' as they appear in rule 26(b)' but believed the court 'would not be justified in ignoring such a clear and unequivocal pronouncement of the public policy of the state in which it sits.' The claim of privilege was upheld.
 
 
 38
 Confidential communications between client and attorney were privileged under common law. The privilege is of ancient origin. Prichard v. United States, 6 Cir., 1950, 181 F.2d 326, affirmed, 339 U.S. 974, 70 S.Ct. 1029, 94 L.Ed. 1380. The doctrine is subject to statutory regulation and limitation, but except as so modified the statutes are merely declaratory of the common law rule. 97 C.J.S. Witnesses 276. The doctrine is based on public policy. While it is the great purpose of law to ascertain the truth, there is the countervailing necessity of insuring the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense. This assistance can be made safely and readily available only when the client is free from the consequences of apprehension of disclosure by reason of the subsequent statements of the skilled lawyer.
 
 
 39
 The government recognizes this general rule, but urges that it does not apply to the identity of the client, i.e. to the fact of employment as distinguished from the subject matter of the communication.
 
 
 40
 The government cites VIII Wigmore on Evidence 2313 (3rd Ed. 1940), in support of its distinction. Wigmore says:
 
 
 41
 'The identity of the attorney's client * * * will seldom be a matter communicated in confidence; for the procedure of litigation ordinarily presupposes a disclosure of these facts * * *. Every litigant is in justice entitled to know the identity of his opponents. He cannot be obliged to struggle in the dark against unknown forces * * *. The privilege cannot be used to evade a client's responsibility for the use of legal process; and if it is necessary for that purpose to make a plain exception to the rule of confidence then it must be made. * * *
 
 
 42
 'On the other hand, the litigant is not entitled to ask any more than serves to fix the client's identity. A communication as to * * * the ultimate motive of the litigation, is equally protected with others, so far as any policy of privilege is concerned. * * * There is not entire harmony in the rulings * * * (for this much mooted class of cases) but no doubt much ought to depend upon the circumstances of each case.'
 
 
 43
 In support of this statement, many cases are cited by the government, some upholding the privilege as to identity of the client,[7] some denying it.[8] But as Wigmore says, much ought to depend on the circumstances of each case. In the instant case, a disclosure of the persons employing the attorney-appellant would disclose the persons paying the tax; the fact of payment indicates clearly what is here specifically admitted, that an additional tax was payable and that the unknown clients owed it. But as yet the clients are unnamed. Suppose those unknown clients had related certain facts to their attorney, and asked that attorney for an opinion as to whether the clients, as taxpayers, owed the government additional taxes. Could the attorney be required to state the information given him in confidence by the clients, and the attorney's advice in response thereto? Or could the government require every tax attorney to reveal the name of those clients who had consulted the attorney with respect to possible taxes payable, so that the government could institute investigations of all such taxpayers?
 
 
 44
 We think the answer is 'no' to both such questions. If it were not, the government could obtain by indirection, through demand for identity of a taxpayer, the information it seeks simply because a certain amount has been paid in as a tax in accordance with a tax law that permits such an anonymous payment. This would disclose the 'ultimate motive of litigation' which Wigmore says the privilege should protect.
 
 
 45
 Had the taxpayers filed suit against the government, then clearly public policy would require the taxpayers' attorney to reveal for whom the attorney was acting. The government should not, any more than a private party, be required once litigation is commenced 'to struggle in the dark against unknown forces.'
 
 
 46
 But here no litigation exists. The taxpayers have sought no judicial determination of the correctness of the amount paid, nor even of the fact that any sum is owed by them. They have merely stated, through an attorney, 'I am worried about my position if the government ever investigates my tax return. Hence I deem it wise to pay X dollars to the government now.'
 
 
 47
 In a very recent case, where the difficult balance between 'full disclosure' and 'privileged communication' was struck the court said:
 
 
 48
 'Throughout their judicial endeavors courts seek truth and justice and their search is aided significantly by the fundamental principle of full disclosure. When that principle conflicts with the attorney-client privilege it must, of course, give way but only to the extent necessary to vindicate the privilege and its underlying purposes. The matter is truly one of balance.' In re Richardson, 1960, 31 N.J. 391, 157 A.2d 695, at page 701.
 
 
 49
 'The privilege must be shaped and the balance struck accordingly.'[9] The reason for the striking of the balance, as was done in such cases as United States v. Lee, C.C.E.D.N.Y.1901, 107 F. 702;[10] Mauch v. Commissioner, 3 Cir., 1940, 113 F.2d 555;[11] and Tomlinson v. United States, 1937, 68 App.D.C. 652, 93 F.2d 652, 655,[12] is obvious. And see Behrens v. Hironimus, 4 Cir., 1948, 170 F.2d 627, a habeas corpus case (cited properly by appellee as authority that the fact of employment was not privileged) where the West Virginia statute as to privilege was assumed to be controlling.
 
 
 50
 These cases hold that, under their own facts, the objection of one real client, though valid, must yield to any great interest of that body of clients, the public. There is no question but that it is at times vital to the administration of justice to require disclosure of a client's name.
 
 
 51
 We conclude there is no federal body of law that requires the exclusion of the identity of the client from the extent of the attorney-client privilege. We believe it must be assessed on a case to case basis, depending on the particular facts of each case. We recognize that the policy of full disclosure is a 'more fundamental one' than the policy of the attorney-client privilege; that the latter is not universally regarded as absolute, and is to be strictly limited to the purposes for which it exists. VIII Wigmore on Evidence 2291, p. 557. If the identification of the client conveys information which ordinarily would be conceded to be part of the usual privileged communication between attorney and client, then the privilege should extend to such indentification in the absence of other factors. Such factors are (a) the commencing of litigation on behalf of the client where he voluntarily subjects himself to the jurisdiction of the court; (b) an identification relating to an employment by some third person, not the client nor his agent; (c) an employment of an attorney with respect to future criminal or fraudulent transactions; (d) the attorney himself being a defendant in a criminal matter. In none of these categories, and perhaps not in others, would the suppressing of some truth, so that the general process of administering justice may be furthered, outweigh the desirability of the rule of privilege; itself an exception to the general view 'that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice.' In re Selser, 1954, 15 N.J. 393, 105 A.2d 395, 401.
 
 
 52
 In summation, we find (1) that because the relationship of client and attorney is created and controlled by the law of the various states; and that such creation and control is recognized, follwed, and approved by the federal courts, the nature and extent of the privilege created between a lawyer and his client by the attorney-client relationship requires the federal courts to follow the state law; (2) that some considerable number of federal cases enunciate the rule that the state law governs the rule of privilege; (3) that some federal cases apply the law of the forum state, but do so without enunciating the principle under which they act; (4) that no federal statute forbids the use of the law of the forum state, and that if there is any definite rule set up by federal statute, it requires us to follow the law of the forum state, and (5) any federal 'common law' which may exist does not require us to ignore the forum state law; (6) that general policy considerations applicable to the law of privilege between attorney and client support the rule of privilege in this case; (7) that each case must stand on its own facts, with the courts balancing the public policy considerations involved, and we hold the law of the forum state should, and does control-- here the State of California.
 
 
 53
 We next examine the California law. Appellee asserts that while the federal 'common law as to privilege' controls, were the law of California to govern, the result would be no different. This rests on the government's position that Brunner v. Superior Court, 1959, 51 Cal.2d 616, 335 P.2d 484, overrules Ex parte McDonough, 1915, 170 Cal. 230, 149 P. 566, L.R.A.1916C, 593. We think not.
 
 
 54
 Mr. Justice McComb in writing the Brunner decision, cited the general rule, and then referred to Ex parte McDonough.[13] He did not cite it as controlling, nor did he differentiate it, nor specifically overrule it. We infer that it is cited as an exception to the general rule. Thus, McDonough, on its facts, is still the law of California.
 
 
 55
 Our problem is thus narrowed, not to whether there are no exceptions to the general rule (that ordinarily the attorney-client privilege does not include the identity of the client), but whether the exception recognized in Ex parte McDonough is here controlling. 97 C.J. Witnesses 283 e., p. 803, in discussing this exception, states:
 
 
 56
 'The name of the client will be considered privileged matter where the circumstances of the case are such that the name of the client is material only for the purpose of showing an acknowledgment of guilt on the part of such client of the very offenses on account of which the attorney was employed * * *'
 
 
 57
 The facts of the instant case bring it squarely within that exception to the general rule. Here money was received by the government, paid by persons who thereby admitted they had not paid a sufficient amount in income taxes some one or more years in the past. The names of the clients are useful to the government for but one purpose-- to ascertain which taxpayers think they were delinquent, so that it may check the records for that one year or several years. The volunteer nature of the payment indicates a belief by the taxpayers that more taxes or interest or penalties are due than the sum previously paid, if any. It indicates a feeling of guilt for nonpayment of taxes, though whether it is criminal guilt is undisclosed. But it may well be the link that could form the chain of testimony necessary to convict an individual of a federal crime.[14] Certainly the payment and the feeling of guilt are the reasons the attorney here involved was employed-- to advise his clients what, under the circumstances, shoudl be done.
 
 
 58
 In striking the balance between the public benefit that might be achieved through permitting a government audit of the tax returns against the sacredness of the attorney's obligation to keep inviolate the secrecy of the client's confidence, we must consider the weakness or strength of the attorney's obligation to his client under California law. In addition to the more recent creation of Section 6068(e) of the California Business and Professions Code, we find Section 1881 of the California Code of Civil Procedure. It first expresses the considered policy of the State in this regard.
 
 
 59
 'There are particular relations (it reads) in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the following cases:
 
 
 60
 '2. Attorney and client. An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment * * *'
 
 III. Strength of Privilege in California
 
 61
 The policy as to the attorney-client relationship is declared as an absolute privilege-- there is no exception created by statute. The legislature saw fit to make an exception as to physicians and patients (Cal.Code Civ.P. 1881, subd. 4); as to public officers (Cal.Code Civ.P. 1881, subd. 5); as to newsmen[15] (Cal.Code civ.P. 1881, subd. 6), and evem as to certain communications between husband and wife. The priest or clergyman can be examined as to a confession if it is made to him other than 'in the course of discipline enjoined by the church to which he belongs.' Cal.Code Civ.P. 1881, subd. 3. But the client's privilege extends to 'any communication.' It is absolute, and without exception.
 
 
 62
 The attorney's privilege stands today as it did in 1872, when the statute was enacted, and substantially as it was when 1881, subd. 2 was Civil Practice Act, 396, enacted in 1851. Other privileges have been added, and privilege, generally, has been modified from time to time.[16]
 
 
 63
 The maintenance of such privilege has been ruled of such importance by the California courts that even if the client waived the privilege by written contract, his attorney cannot rely on the waiver, nor can he violate the privilege. The contract will be set aside. In re Boone, C.C.N.D.Cal.1897, 83 F. 944.[17] And generally, see Stockton Theatres, Inc. v. Palermo, 1953, 121 Cal.App.2d 616, 625, 264 P.2d 74; In re Soale, 1916, 31 Cal.App. 144, 159 P. 1065.
 
 
 64
 The instant case discloses none of the reasons which public policy might dictate should cause the 'balancing' of equities in favor of compelling disclosure. The client has filed no suit against the government and has not voluntarily subjected himself to the jurisdiction of a court, nor sought its aid. The attorney was employed by the clients he seeks to protect, even though this contact came through an agent. The employment has no reference to future criminal or fraudulent transactions involving the clients. The attorney himself has nor relied upon a privilege, real or imagined, to protect his own skirts in the defense of a criminal charge filed against him. We find no other fact or peculiar circumstance, which, in our opinion, outweighs the desirability of the rule of privilege.
 
 
 65
 We hold that Ex parte McDonough, supra, states the law of California,[18] and Brunner v. Superior Court, supra, does not, under the facts existing here. Under those facts, an attorney cannot be compelled to state the names of clients who employed him to voluntarily mail sums of money to the government in payment of undetermined income taxes, unsued on, and with no government audit or investigation into that client's income tax liability pending.
 
 
 66
 If there be a question whether the McDonough rule includes communications made prior to the employment, including the name of the client, as distinguished from communications made only after employment, we have no hesitation in saying that once the rule of the forum state is held controlling, it should, and does, apply to pre-employment communications as well as post-employment. That has long been the California rule.[19]
 
 
 67
 As has been said,
 
 
 68
 'It is the glory of our profession that its fidelity to its client can be depended on; that a man may safely go to a lawyer and converse with him upon his rights or supposed rights in any litigation with the absolute assurance that that lawyer's tongue is tied from ever disclosing it * * *' United States v. Costen, C.C.D.Colo.1889, 28 F. 24 (opinion by Mr. Justice Brewer, then Circuit Judge).
 
 
 69
 This brings us to the government's second point, that no attorney-client relationship existed here. This apparently is urged by the government upon the ground (a) that there were other attorneys representing the taxpayers; (b) that the communications (at the first meeting) were from third persons (agents of the taxpayers, no the taxpayers); (c) that appellant was merely a transmitter-- a banker-- and did not act as a lawyer in sending the money.
 
 
 70
 We regard the first ground, urged in support of this second point, as inconsequential and as immaterial. The second ground is not well taken in law. City & County of S.F. v. Superior Court, 1951, 37 Cal.2d 227, 236-367, 231 P.2d 26, 25 A.L.R.2d 1418. VIII Wigmore on Evidence 2317 (3rd Ed. 1940). The third ground is an incorrect interpretation of the facts.
 
 
 71
 Under our view of the law applicable to the facts of this case, we need not go into other points raised by either appellant, including those relating to pleading, and self-incrimination on the one hand, and the failure of Baird to answer additional questions on the other.
 
 
 72
 The judgment of the lower court is reversed so far as it orders appellant Baird to reveal any information regarding the persons who employed him, and affirmed as to those questions which it held appellant Baird need not answer.
 
 
 
 [1]
 Appellant was not required to testify as to nor disclose (1) the identity and addresses of the accountants with whom he had had the discussions involving the affairs of the unidentified taxpayers in whose behalf he sent a cashier's check in the sum of $12,706.85 to the Director of Internal Revenue in Baltimore, Maryland; (2) the identity and address of the attorney who employed him to send said cashier's check; and (3) the places where the meetings with the accountants and the attorney took place
 
 
 [2]
 The State Bar of California is made up of members admitted and licensed to practice law. (See 6060 et seq., Cal. Bus. & Prof.Code.) Each attorney must take an oath, agreeing, among other things, 'faithfully to discharge the duties of any attorney at law.' Id., 6067. Among those duties prescribed is 'to maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client.' Id., 6068(e)
 
 
 [3]
 Aetna Life Ins. Co. v. McAdoo, 8 Cir., 1939, 106 F.2d 618; Thompson v. Smith, 1939, 70 App.D.C. 65, 103 F.2d 936, 123 A.L.R. 76; Federal Mining & Smelting Co. v. Dalo, 9 Cir., 1918, 252 F. 356; Pennsylvania R. Co. v. Durkee, 2 Cir., 1906, 147 F. 99; Adamos v. New York Life Ins. Co., D.C.W.D.Pa.1937, 22 F.Supp. 162, affirmed 3 Cir., 94 F.2d 943
 And see generally: Wright v. Wilson, 3 Cir., 1946, 154 F.2d 616, 170 A.L.R. 1237; Collins v. Howard, D.C.S.D.Ga. 1957, 156 F.Supp. 322; Fahey v. United States, D.C.S.D.N.Y.1955, 18 F.R.D. 231.
 
 
 [4]
 It is noted here, to be referred to later, that in the dissent by Judge Learned Hand, he agrees that the 'retainer of an attorney for himself involved no privileged communication.' Yet, he said, 'that direction to his own attorney * * * (to represent another person) was as much a privileged communication as any direction would have been, made in the course of preparing for trial; as much, for example, as to tell one's attorney to interview a witness. That it was an important step in connecting him with the woman's prostitution, admits of no debate.' United States v. Pape, supra, 144 F.2d at pages 783-784
 
 
 [5]
 Rosenberg v. Carroll, D.C.S.D.N.Y.1951, 99 F.Supp. 629; People ex rel. Mooney v. Sheriff of New York County, 1936, 269 N.Y.S. 291, 199 N.E. 415, 102 A.L.R. 769
 
 
 [6]
 14 F.R.D. at page 353. Citing Aetna Life Ins. Co. v. McAdoo, 8 Cir., 1939, 106 F.2d 618, and Munzer v. Swedish American Line, supra
 
 
 [7]
 Chirac v. Reinecker, 1826, 11 Wheat. 280, 24 U.S. 280, 6 L.Ed. 474; Ex parte McDonough, 1015, 170 Cal. 230, 149 P. 566, L.R.A.1916C, 593
 
 
 [8]
 Behrens v. Hironimus, 4 Cir., 1948, 170 F.2d 627; United States v. Pape, 2 Cir., 1944, 144 F.2d 778; Goddard v. United States, 5 Cir., 1942, 131 F.2d 220; Mauch v. Commissioner, 3 Cir., 1940, 113 F.2d 555; Kaufman v. United States, 2 Cir., 1914, 212 F. 613; United States v. Lee, C.C.E.D.N.Y.1901, 107 F. 702; Gretsky v. Miller, D.C.Mass.1958, 160 F.Supp. 914; People v. Warden of County Jail, 1934, 150 Misc. 714, 270 N.Y.S. 362
 
 
 [9]
 Mauch v. Commissioner, 3 Cir., 1940, 113 F.2d 555, at page 556
 
 
 [10]
 Where an attorney refused to testify as to the identity of a third party who had employed him to represent an indicted defendant, who, when released on bail, fled
 
 
 [11]
 Where an attorney 'charged with defrauding (the) public' fighting his own income tax fraud prosecution, refused to name the clients from whom he had allegedly received $20,000 in each of two years, placed such sums in his bank account, but had failed to report it in his income tax returns. But see the language of Judge Clark, referring to 'unimpressive reasoning' in those cases requiring disclosure; the 'particular considerations' that appear when litigation is actually pending, and the observation that: 'It is clear that clients may desire freedom to (consult) as much as freedom of consultation.' Mauch v. Commissioner, supra, 113 F.2d at page 556
 
 
 [12]
 'There a lawyer charged with robbery was asked on cross-examination for the name of a client who had brought a witness against him into his office. He was compelled by the trial court to answer over claim of privilege. We subscribe to the decision of the learned court and quote briefly from the opinion of Mr. Justice Miller: '* * * To apply it to prevent normal cross-examination in such a case as the present would unnecessarily encourage deception, and defeat the purpose of cross-examination. 'The court has a right to know that the client whose secret is treasured is actual flesh and blood, and demand his identification, for the purpose, at least, of testing the statement which has been made by the attorney who places before him the shield of this privilege.' United States v. Lee, supra (C.C.) 107 F. 702, at page 704." Mauch v. Commissioner, supra, 113 F.2d at page 557, discussing and quoting Tomlinson v. United States, supra
 
 
 [13]
 In Brunner, 51 Cal.2d at page 618, 335 P.2d at page 486, Mr. Justice McComb of the California Supreme Court has before him the question of privilege as to the identification of a person who consulted an attorney relative to possible employment. The court held there was no error in requiring disclosure. 'Petitioner does not claim that the privilege would exist if the person who consulted him was not a client of his. However, it is the general rule that an attorney is not privileged to withhold disclosing by whom he has been employed. (Satterlee v. Bliss, 36 Cal. 489, 507; Tomlinson v. United States, 68 App.D.C. 106, 93 F.2d 652, 655, 114 A.L.R. 1315 (8-10); See Annotation 114 A.L.R. 1321, et seq. (1938). Cf. Ex parte McDonough, 170 Cal. 230, 238, 149 P. 566, L.R.A.1916C, 593.) Therefore, even if the person who consulted petitioner were his client, petitioner can still be required to reveal the person's name.'
 
 
 [14]
 Hoffman v. United States, 1951, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118
 
 
 [15]
 Requirement that the information be published
 
 
 [16]
 Privilege and the policy befind it has been before the legislature at least ten times, i.e., in 1893, 1901, 1907, 1911, 1917, 1927, 1933, 1935, 1939, 1957. The privilege has been specifically extended as late as 1957 by the legislature to testimony offered by deposition (Cal.Code Civ.P. 2016(b)). This extension has been carefully set forth as follows:
 'All matters which are privileged against disclosure upon the trial under the law of this State are privileged against disclosure through any discovery procedure. This article shall not be construed to change the law of this State with respect to the existence of any privilege, whether provided for by statute or judicial decision, nor shall it be construed to incorporate by reference any judicial decisions on privilege of any other jurisdiction.'
 This privilege extends, as of January 1, 1958, even to depositions taken outside the State of California (where other rules of privilege might ordinarily apply). Cal.Code Civ.P. 2029.
 
 
 [17]
 'a client cannot consent that an attorney should be released from obligations which the law imposes upon his * * *. In determining * * * the * * * release is void, I am guided by reasons of public policy, and by considerations which relate to the due and orderly administration of justice, to the honor and purity of the profession, to the protection of clients, and to the dignity of the court itself.' In re Boone, supra, 83 F. at page 957
 
 
 [18]
 'However desirable it may be to obtain proofs sufficient to insure the conviction of all persons who commit crimes * * * such proofs may not be obtained from those who are forbidden by law to give them. In regard to the obligation of an attorney to his client in this respect, our statutes are very explicit, making it his (the attorney's) duty to 'maintain inviolate the confidence, and at every peril to himself, to preserve the secrets of his client.' * * *
 '* * * We cannot escape the conclusion that, in view of the findings of the lower court, to require the petitioner (attorney) to answer any of the questions as to the name of the client who employed him to defend Higgins et al. would be to require him to divulge a confidential communication made to him by a client in the course of his employment-- a communication tending to show, and, under the circumstances of this case, material only for the purpose of showing, an acknowledgment of guilt on the part of such client of the very offenses on account of which the attorney had been employed to defend him.'
 Ex parte McDonough, supra, 170 Cal. at pages 233, 236-237, 149 P. at page 566.
 Of interest also is the 'answer' to a question on legal ethics appearing in Cal. State Bar Journal, Vol. 3, 1928-1929, as follows:
 'A client consults an attorney stating that she has found a watch for which the owner has advertised, offering a stated reward, directing the attorney to deliver it for the reward but not to disclose the client's identity. Upon the refusal of the attorney to disclose the identity of his client, a warrant is issued for the arrest of the attorney upon a charge of grand theft and, upon demand of the police for surrender of the watch and threat of issuance of a search warrant, the watch was delivered to the police. The client still insists upon secrecy with reference to her identity. Is it professionally proper for the attorney to disclose the name of his client?
 'Answer
 'The committee is of the opinion that it is not professionally proper for the attorney to disclose the name of his client under the circumstances stated in the foregoing question, since it is the duty of an attorney-at-law to maintain inviolate the confidences, and, at every peril to himself, to preserve the secrets of his client. (Sec. 282, Subdivision 5-- Code of Civil Procedure.)'
 
 
 [19]
 People v. Abair, 1951, 102 Cal.App.2d 765, 228 P.2d 336; People v. Dorrance, 1944, 65 Cal.App.2d 125, 150 P.2d 10; Estate of Dupont, 1943, 60 Cal.App.2d 276, 140 P.2d 866; VIII Wigmore on Evidence 2304 (3rd Ed. 1940)