### In re GRAND JURY SUBPOENA, M. Randall PEEK.

### No. 87–155–M.

United States District Court, M.D. Georgia.

Dec. 21, 1987.

---

**1.** The Court finds that no bond is necessary in light of section 632.

Miriam Duke, Macon, Ga., for petitioner.

Victoria D. Little, Decatur, Ga., for respondent.

## ORDER

OWENS, Chief Judge.

M. Randall Peek, an attorney at law of Decatur, Georgia, was subpoenaed and testified before a grand jury of this court on September 15, 1987, as to fees paid him by Jimmy Lee Jeffries, Johnny Griggs, Sr., Betty Jeffries, Jessie James Griggs, James Legraph Wyatt, Cornelia Griggs, and Joanne Rogers Griggs but did not produce any records as to the receipt of said fees. He testified that "I will supplement that response and furnish you all the information I have subject to the subpoena." (Attached Tr. pp. 1560–61).

Mr. Peek was also asked about two promissory notes, Exhibits 1 and 2. He responded to questions about both notes— Attached Tr. pp. 1561–62—and did not at any point refuse to answer or claim any privilege.

Subpoenaed again before the grand jury, Mr. Peek, on the day of his testimony, December 8, 1987, filed a motion to quash. By agreement of Mr. Peek's counsel, Ms. Victoria Little, and government counsel, the motion was orally restated and limited to the question of whether or not Mr. Peek could refuse on account of the attorney-client privilege to answer the grand jury's questions calling upon him to disclose the person from whom he borrowed the $15,-000 represented by Grand Jury Exhibit 1 and calling upon him to disclose whether Cornelia Griggs was the true or nominal payee of the $10,000 promissory note which is Grand Jury Exhibit 2.

At an *in camera* hearing Mr. Peek testified under oath. That hearing has not been, but can be, transcribed under seal if Mr. Peek wishes to have it transcribed.

As to Grand Jury Exhibit 1, Mr. Peek takes the position that Cornelia Griggs' name was inserted in the promissory note at the express direction of another client who furnished whatever money was received by Mr. Peek and who directed Mr. Peek to never disclose his identity. Cornelia Griggs furnished no money and is thus the nominal party in interest. Mr. Peek told the grand jury that he personally borrowed the money represented by the note.

As to Grand Jury Exhibit 2, Mr. Peek states that while the promissory note was prepared in his office it was prepared for a client whose name doesn't appear on said note and with the understanding that Mr. Peek would not disclose the identity of the client.

Following said hearing, counsel for Mr. Peek and the grand jury submitted the cases that they each rely upon and those were carefully considered.

On December 15, 1987, indictment 87–36 Macon Division returned on December 10, 1987, was unsealed on account of the arrest of most of the twenty-six named defendants. Of the persons named in the grand jury subpoena served upon Mr. Peek, every person except Cornelia Griggs, mother of

defendants Jimmy Lee Jeffries and Johnny Lee Griggs, was indicted upon drug and/or income tax charges. Neither Mr. Peek nor Carleitha West, the payor of Grand Jury Exhibit 2, are named in the indictment, and the indictment does not mention any December 29, 1982, monetary transaction.

Can Mr. Peek refuse to testify about either promissory note because of his assertion of the attorney-client privilege?

In *United States v. Ponder*, 475 F.2d 37, 39 (1973), the Fifth Circuit Court of Appeals defined the privilege saying:

> The [attorney-client] privilege applies to communications between lawyer and client, and, to come within the scope of the privilege, an attorney must show that the communication was made to him confidentially, in his professional capacity, for the purpose of securing legal advice or assistance.

The Fifth Circuit Court of Appeals in *In re Grand Jury Proceedings (United States v. Jones)*, 517 F.2d 666, 670 (5th Cir.1975), discussed the privilege in greater depth and detail, to wit:

> The basic elements which are necessary in order to establish a claim of the client's privilege are the following:
>
> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Machinery Corp.*, D.Mass 1950, 89 F.Supp. 357, 358–59. We utilize this description solely because of Judge Wyzanski's comprehen-

siveness, and not because it is any more accurate than a number of other widely-accepted general formulations. *E.g.*, 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961); C. McCormick, Evidence §§ 87–88 (Cleary ed. 1972).

The true difficulty comes not in listing the necessary ingredients, but in applying the usual tests to unique fact situations. Along with many other courts, we have stated that "[t]he identity of a client is a matter not normally within the privilege, *Frank v. Tomlinson*, 351 F.2d 384 (5th Cir.1965), *cert. denied*, 382 U.S. 1028, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966), nor are matters involving the receipt of fees from a client usually privileged, *see United States v. Finley*, 434 F.2d 596 (5th Cir.1970)." *United States v. Ponder*, 5 Cir.1973, 475 F.2d 37, 39 (emphasis added).

\* \* \* \* \* \*

Despite the general rule, we have clearly recognized, albeit in dicta, that an exception exists. "Under certain circumstances, an attorney must conceal even the identity of a client, not merely his communication, from inquiry." *American Can Co. v. Citrus Feed Co.*, 5 Cir. 1971, 436 F.2d 1125, 1128, *citing Baird v. Koerner*, 9 Cir.1960, 279 F.2d 623, 635. The well-known *Baird* case, which involved an IRS summons seeking disclosure of the identity of the client on whose behalf the witness-lawyer had made an anonymous tax payment, was followed in *Tillotson v. Boughner*, 7 Cir. 1965, 350 F.2d 663, and *NLRB v. Harvey*, 4 Cir.1965, 349 F.2d 900. Our cases have split with *Baird* only to the extent that the Ninth Circuit has followed state law in deciding issues of evidentiary privilege. *E.g., In re Michaelson*, 9 Cir.1975, 511 F.2d 882, *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975). The exception announced in *Baird*, where applicable, is as much a part of this circuit's federal law of evidence as is the normal rule of no privilege. We so hold.

The cases applying the exception have carved out only a limited and rarely

available sanctuary, which by virtue of its very nature must be considered on a case-to-case basis. It could hardly be otherwise, since the purpose of privilege —to suppress truth—runs counter to the dominant aims of the law. The exception, however, though sometimes difficult to grasp and apply, is not quite so confined as the government would make it. The government and the court below have taken the position that a client's identity, fee, and bonding arrangements can never be privileged unless disclosure would lead automatically to conviction for a criminal offense.

That is not the law. We quote from the portion of the *Baird* decision which states the essence of the analysis, and demonstrates that the correct approach is a matter of logical relevance and probative value—not quantum sufficiency:

> The facts of the instant case bring it squarely within the exception to the general rule. Here money was received by the government, paid by persons who thereby admitted they had not paid a sufficient amount in income taxes some one or more years in the past. The names of the clients are useful to the government for but one purpose—to ascertain which taxpayers think they were delinquent, so that it may check the records for that one year or several years. The volunteer nature of the payment indicates a belief by the taxpayers that more taxes or interest or penalties are due than the sum previously paid, if any. It indicates a feeling of guilt for nonpayment of taxes, though whether it is criminal guilt is undisclosed. But it may well be the link that could form the chain of testimony necessary to convict an individual of a federal crime. (citing in footnote the classic Fifth Amendment case, *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). Certainly the payment and the feeling of guilt are the reasons the attorney here involved was employed—to advise his clients what, under the circumstances, should be done.

279 F.2d at 633 (emphasis added). In *Baird* the Ninth Circuit took counsel in Wigmore's admonitions that "much ought to depend on the circumstances of each case," and that the privilege should be held to protect the client from disclosure by the attorney of the client's "ultimate motive" for seeking legal advice. *Id.* at 630. In *Harvey* the Fourth Circuit refined the exception another degree: "The privilege may be recognized when so much of the actual communication has already been disclosed [not necessarily by the attorney, but by independent sources as well] that identification of the client amounts to disclosure of a confidential communication." 349 F.2d at 905. There the first link in the chain of evidence had been supplied by a private detective who, on pain of contempt, admitted that he had been hired by attorney Harvey to spy on a union organizer. The revelation indicated the obvious— that a third party had hired Harvey. It was the third party's identity which the Labor Board sought to compel Harvey to disclose, but which the court thought was in all likelihood privileged because "upon identification of the client, it will be known that the client wanted information about [the organizer]. More than the identity of the client will be disclosed by naming the client." *Id.* Yet it was far from certain that the client, if identified, would be found guilty of an unfair labor practice—to use the words of the district judge in this case—"as night follows day." (footnotes omitted).

### Grand Jury Exhibit 1

Mr. Peek personally borrowed money from a person who was also his client and executed Grand Jury Exhibit 1 to evidence his personal obligation to repay that person. Upon his client's instruction he inserted the name of a nominal party in interest as payee and upon his client's instruction he refuses to disclose the identity of the

real party in interest, the party who actually loaned him the money.

"The burden of establishing both the existence of the attorney-client relationship and the confidential nature of the communication is . . ." upon Mr. Peek, "the party who invokes the attorney-client privilege." *In re Grand Jury Proceedings*, 680 F.2d 1026, 1029 (5th Cir.1982 (Unit A).

Has Mr. Peek shown the existence of the attorney-client relationship as to what he did and what he knows about the personal loan made to him by a person who was also his client?

The word client means:

A person who employs or retains an attorney, or counsellor, to appear for him in courts, advise, assist, and defend him in legal proceedings, and to act for him in any legal business. *McCreary v. Hoopes*, 25 Miss. 428; *McFarland v. Crary*, 6 Wend., N.Y., 297; *Cross v. Riggins*, 50 Mo. 335. It should include one who disclosed confidential matters to attorney while seeking professional aid, whether attorney was employed or not. *Sitton v. Peyree*, 117 Or. 107, 241 P. 62, 64 [1925].

*Black's Law Dictionary*, Revised 4th Ed. 1968.

■ A person who loans money to a lawyer for the lawyer's personal use and who in return receives a promissory note prepared and executed by the lawyer to evidence the lawyer's personal obligation to repay the loan, is obviously not a person who has employed or retained the attorney to advise or assist him as a lawyer or to act for him. He didn't employ the lawyer. He didn't seek or get advice or assistance from the lawyer. He simply loaned the lawyer money. In borrowing money for his own personal use, the lawyer acted for himself; in loaning money to the lawyer for his personal use, the lender acted for himself. The lawyer had a 100% pecuniary interest in the transaction and thus could hardly be said to have been looking after anyone's interest other than his own. Otherwise, everything that a lawyer does for himself or herself would be cloaked with a privilege just because he or she is a lawyer. The privilege was never intended to encompass a lawyer's purely personal business and in this instance doesn't encompass this lawyer's purely personal loan transaction with a person who, for this transaction, was not this lawyer's client.

The petitioner-witness' motion to quash as to Grand Jury Exhibit 1 is thus DENIED. He may be questioned by the grand jury about the identity of the real party in interest as to Grand Jury Exhibit 1.

### Grand Jury Exhibit 2

■ Mr. Peek asserts and testifies that the real party in interest as to Exhibit 2 is a person who was his client; who employed him to prepare Exhibit 2; who instructed him to insert the name of a nominal party in interest as the payee; and who instructed him not to disclose his own identity. He states that his client was not any person named in the subpoena. Assuming the truth of his *in camera* testimony, the unnamed client was not one of the persons named in the indictment. Mr. Peek has thus carried the burden of proving the existence of the attorney-client relationship and the confidential nature of the communication. As already pointed out by *In re Grand Jury Proceedings*, 517 F.2d at 671, however "the identity of a client is a matter not normally within the privilege." Must Mr. Peek, therefore, reveal the identity of his client? To answer that question the court must determine whether the *Baird* exception applies. Would the disclosure by Mr. Peek of this client's identity possibly be the last link in the chain of inculpatory evidence, *In re Grand Jury Proceedings*, 680 F.2d 1026 (5th Cir.1982), thus resulting in a superseded indictment adding that client as a defendant?

The grand jury has had no opportunity to demonstrate to the court that the *Baird* or "last link" exception does not apply. Until such a showing is made, the court is unwill-

ing to order Mr. Peek to disclose the identity of the client for whom he prepared Grand Jury Exhibit 2.

Without prejudice to the grand jury's right to make such a showing and convince the court that Mr. Peek should be required to testify, the motion to quash is GRANTED as to Grand Jury Exhibit 2.

Mr. Peek and his counsel agreed that if Mr. Peek were required to testify, his testimony would be given by deposition in lieu of his having to again personally appear before a grand jury. That deposition shall be taken at a time and place mutually agreed upon by counsel.

**1558**

$ 15,000.00          Decatur          , Georgia, December 29, 19 82

FOR VALUE RECEIVED,___I___promise to pay to the order of __CORNELIA · GRIGGS__

_____the principal sum of

FIFTEEN THOUSAND & NO/HUNDREDTHS ---------- ($ 15,000.00 ) DOLLARS,

in legal tender of the United States, with interest thereon from date at the rate of twenty (20) (_20_%) per centum per annum, on the unpaid balance until paid, in_ one (1)

installments, as follows:   the entire debt being due and payable in full

including principal and interest one year from date

herein, to-wit: December 29, 1983.

Principal and interest are payable at:_ Decatur, Georgia

or at such other place as the holder hereof may designate in writing.

Should any installment not be paid when due, or should the maker, or makers, hereof fail to comply with any of the terms or requirements of a security deed of even date herewith, convey-ing title to real property located in__ Rockdale County, Georgia

as security for this indebtedness, the entire unpaid principal sum evidenced by this note, with all accrued interest, shall, at the option of the holder, and without notice to the undersigned, become due and may be collected forthwith, time being of the essence of this contract. It is further agreed that failure of the holder to exercise this right of accelerating the maturity of the debt, or indulgence granted from time to time, shall in no event be considered as a waiver of such right of acceleration or estop the holder from exercising such right.

In case this note is collected by law, as through an attorney at law, all costs of collection, including fifteen per centum (15%) of the principal and interest as attorney's fees, shall be paid by the maker hereof.

And each of us, whether maker and endorser, guarantor, or surety, hereby severally waives and renounces, for himself and family, any and all exemption rights either of us, or the family of either of us, may have under or by virtue of the Constitution or laws of Georgia, or any other State, or the United States, as against this debt or any renewal thereof; and each further waives demand, protest and notice of demand, protest and non-payment.

In case of default in the payment of any one of the aforesaid installments, and in case the holder of this note should elect, on account of such default, to declare the unpaid balance of the principal sum due and payable, said principal sum, or so much thereof as may remain unpaid at the time of such default, shall bear interest at the rate of eight per centum (8%) per annum from the date of such default.

This contract is to be construed in all respects and enforced according to the laws of the State of Georgia.

**Prepayment Privilege:**

WITNESS..............hand.__ and seal          _M. Randall Peek_ (SEAL)

M. Randall Peek

....................................................(SEAL)

....................................................(SEAL)

IVAN ALLEN CO

$ 10,000.00      Decatur              , Georgia, December 29, 19 82

FOR VALUE RECEIVED, __I__ promise to pay to the order of __CORNELIA · GRIGGS__

_____ the principal sum of

Ten Thousand and no/hundredths ----------- ($ 10,000.00 ) DOLLARS,

in legal tender of the United States, with interest thereon from date at the rate of __twenty__ (__20__ %) per centum per annum, on the unpaid balance until paid, in __one (1)__ installments, as follows:

the entire debt, including principal

and interest shall be due and payable one year from

date herein, to-wit: December 29, 1983.

Principal and interest are payable at: __Decatur, Georgia__ or at such other place as the holder hereof may designate in writing.

Should any installment not be paid when due, or should the maker, or makers, hereof fail to comply with any of the terms or requirements of a security deed of even date herewith, conveying title to real property located in __Fulton County, Georgia__ as security for this indebtedness, the entire unpaid principal sum evidenced by this note, with all accrued interest, shall, at the option of the holder, and without notice to the undersigned, become due and may be collected forthwith, time being of the essence of this contract. It is further agreed that failure of the holder to exercise this right of accelerating the maturity of the debt, or indulgence granted from time to time, shall in no event be considered as a waiver of such right of acceleration or estop the holder from exercising such right.

In case this note is collected by law, as through an attorney at law, all costs of collection, including fifteen per centum (15%) of the principal and interest as attorney's fees, shall be paid by the maker hereof.

And each of us, whether maker, endorser, guarantor, or surety, hereby severally waives and renounces, for himself and family, any and all exemption rights either of us, or the family of either of us, may have under or by virtue of the Constitution or laws of Georgia, or any other State, or the United States, as against this debt or any renewal thereof; and each further waives demand, protest and notice of demand, protest and non-payment.

In case of default in the payment of any one of the aforesaid installments, and in case the holder of this note should elect, on account of such default, to declare the unpaid balance of the principal sum due and payable, said principal sum, or so much thereof as may remain unpaid at the time of such default, shall bear interest at the rate of eight per centum (8%) per annum from the date of such default.

This contract is to be construed in all respects and enforced according to the laws of the State of Georgia.

**Prepayment Privilege:** In the event the secured property can be sold, this debt can be paid before the date of December 29, 1982 without forfeiture or penalty.

WITNESS __my__ hand__ and seal

_Carleitha West_ _____(SEAL)
Carleitha West

............................................................................(SEAL)

............................................................................(SEAL)

IVAN ALLEN CO

## TRANSCRIPT

In The United States District Court

For The Middle District of Georgia

Macon Division

In the Matter of:

GRAND JURY INVESTIGATION.

Transcript of the testimony of MERCER RANDALL PEEK, Witness, taken before Linda C. Johnson, Georgia Certified Court Reporter A–777, Federal Grand Jury Proceedings, commencing at 10:35 O'clock A.M., on September 15, 1987, Federal Courthouse, Macon, Georgia.

APPEARANCE:   MS. MERIAM W. DUKE

Assistant United States Attorney

## PROCEEDINGS

MS. DUKE: Mr. Peek, if you'll just stand right by your chair and the Forelady will administer the oath.

THE WITNESS: Thank you.

(Witness sworn by Grand Jury Foreman.)

MS. DUKE: Mr. Peek, before we get started, let me explain to you that I've explained to the Grand Jury that in order to issue a subpoena to an attorney of an individual who is perhaps the subject of a Grand Jury investigation, that the Government must apply to the Department of Justice for approval to do that, and we have done that in your case and did receive approval to subpoena you, and the subpoena was issued based on that approval.

THE WITNESS: And I appreciate that very much. Like you and I said, when it's a non-consensual situation, it affects you and I both. Appreciate it.

Whereupon,

## MERCER RANDALL PEEK

having been first duly sworn by the Grand Jury Foreman, was examined and testified as follows:

## EXAMINATION

BY MS. DUKE:

Q Mr. Peek, would you tell us your full name?

A Mercer Randall Peek.

Q And what is your occupation?

A Lawyer.

Q And where do you practice?

A Decatur, Georgia.

Q And what is your address, please?

A One twenty-five Trinity Place, Room 306, Decatur, 30030.

Q And how long have you practiced in Decatur?

A Nineteen years.

Q Mr. Peek, are you the attorney for Jimmy Lee Jeffries?

A Yes, I am.

Q Are you the attorney for Johnny Lee Griggs, Sr.?

A Yes, I am.

Q What about Johnny Lee Griggs, Jr.?

A No.

Q What about Cornelia Griggs, who is Jimmy Lee Jeffries' and Johnny Lee Griggs' mother?

A I don't think so at this time. Let me make a response, if I may, in that regard. There are two pending cases in the Jasper County Superior Court brought as a result of the search and seizure, and I was hired by Mr. Jeffries and Mr. Griggs first in regard to those case, and I continue to represent the two of them, but there is no active representation of any other people you've named.

Q Do you have any other representation of anybody involved in the investigation other than those I mentioned that were listed in your subpoena?

A Right. I don't believe, Ms. Duke, that I do, with the possible exception that I have spoken with Joanne Rogers Griggs, who is the wife of Johnny Lee Griggs, I

guess it is Senior, and Betty Jeffries, who is the wife of Jimmy Lee Jeffries, in regard to the overall case. I believe that neither one of them are charged at this time, but they may subsequently become charged.

Q   Your subpoena called for you to produce some records concerning fees paid to you by the individuals listed, which are Jimmy Lee Jeffries, Johnny Griggs, Sr., Betty Jeffries, Jessie James Griggs, James LeGraph Wyatt, Cornelia Griggs, Joanne Rogers Griggs. Were you able to get those records to present to the Grand Jury at this time?

A   I'm going to have to supplement those. I have obtained all the information and am able to testify, but what I have done, each of those payments, as I recollect, with the possible exception of one that I can elaborate on, was a cash payment with a receipt given. I had thought those cash receipt books were in with my income tax returns for the respective years in an envelope, but I didn't find them. I will supplement that response and furnish you all the information I have subject to the subpoena.

Q   All right. Fine.

A   With items, if I may elaborate just a little bit to save a little time, with regard to deposits, I found no accounts where any monies were deposited during those years, because I believe they were all cash payments and cash receipts were written, and on what I could find so far, I did not find any security deeds, loans or gifts from any of the people those years, but I will supplement that, also, if I discover anything else.

Q   Okay. Tell us what amounts of fees that you received, then, for these individuals and for what years they covered.

A   Thank you very much. With regard, first, to Jimmy Lee Jeffries, the initial case made that we're considering now was in December of 1986. About, within about three or four days subsequent to that search and seizure, he paid me twenty-five hundred dollars in cash for the representation of his case, which is in Jasper County

Superior Court as well as the matter here. May I continue?

Q   Certainly.

A   Now, with respect to Johnny Lee Griggs, he first hired me in the calendar year nineteen hundred eighty-two, paid me a fee of five hundred dollars for representation of two misdemeanor cases in Jasper County, which went to a trial by jury resulting in a conviction, I believe, and that was the first payment that I received from him in the year nineteen eighty-two. Then, in nineteen eighty-six, subsequent to his arrest there in Jasper County, he also paid a fee of twenty-five hundred dollars in cash in December of 1986. It was within two or three days, Ms. Duke, after his release from jail there concurrent with this. I found no record of Betty Jeffries paying any monies for any case, nor do I recollect that she ever had any case either civil or criminal. Jessie James Griggs paid me a fee of five hundred dollars in nineteen hundred and eighty-four, which either was all in cash or there may have been, as I recollect, a check for part of that, and it was for a felony in Jasper County Superior Court on a probation revocation and a plea to that particular charge, and that was in the calendar year nineteen eighty-four. I found no record of a James LeGraph Wyatt as a client or any money being paid, nor did I find any money being paid by either Cornelia Griggs or Joanne Rogers Griggs on any of the files I had, any closed or open files or any receipts or records I could find for any of those. So, I have been paid, I suppose, to summarize, by Jimmy Lee Jeffries, Johnny Lee Griggs, I guess it is Senior, and Jessie James Griggs.

Q   So, that would cover calendar years 'eighty-two, 'eighty-three, 'eighty-four, 'eighty-five and 'eighty-six as per the subpoena?

A   Right.

Q   You had said no evidence of loans or anything like that. This may be something that you might find a little bit later, but I'm going to label this Grand Jury Exhibit

Number One, and ask you to look at that and see if you can recognize that.

A   Yes.  That's a note with my signature on it, which I would have to look back at my file.  As I recollect it was a loan that I was going to borrow made from Cornelia Griggs back in December of '82, with regard to a piece of property that I was attempting to buy there in Rockdale County, and I did find the note, and I did not see any of this in the file that I had on Jeffries.  It was—I'll have to look back and see, but that is a note dated December 29, 1982, and it is bearing my signature.

Q   All right.  So, where you were borrowing fifteen thousand from Cornelia Griggs?

A   Right.  Right.

Q   It says secured by, I think, real property.

A   Title to real property.  I know it was to be a piece of property in Rockdale County, and as I recollect, I can't remember now if I went ahead.  I do not recall whether or not we received the compensation and went ahead and closed out the piece of property or not, but I will bring my record back for that, because there will be a record on the real estate in Rockdale County.

Q   Okay.  Well, this was not, then, in your representation of Ms. Griggs?

A   No.  That was not a matter that I was representing her in, the best I can recall.  I don't see anything in which I represented her on any either civil or criminal matter, but I do know that that is a note with my name on it, and I do know that there was some discussion about a piece of property in Rockdale County.

Q   Do you remember how you came to borrow the money from Ms. Griggs?

A   I was trying to think.  It was sometime around the same time I had represented Johnny Lee Griggs, and I believe there was a discussion about a piece of property there in Rockdale County that—but I can't remember now without going back to my file, Meriam, honestly, whether or not it came as a result of representing Johnny Lee Griggs and later discussed that matter with his mother there or not.  It may very well have, but I will try to get those records, and if I need to supplement it by oral testimony, I will be glad to come back.

Q   Okay.  Good.  Let me have you look at this one.  It's not in your name.  This is Grand Jury Exhibit Number Two, but it looks like it might have been executed on the same day, December 29th, 1982.  It's a note from a Carlecia West to Cornelia Griggs.  She apparently, from the note, is borrowing ten thousand dollars from Ms. Griggs.  Do you have any memory of that?

A   That looks like the same kind of note here and looks like it might have been prepared at the same time.  Now, there was a piece of property in Fulton County —I at one time had represented Carlecia West on a criminal matter, and as best I can recall, another lawyer became involved and Ms. West was selling a piece of property.  I believe that lawyer's name, and I'm not sure whether this deal—I don't believe this loan here was consummated by myself.  It seems like the note was prepared, and it seems to me that another lawyer named Gary Harris was subsequently employed to close a loan on a piece of property in Fulton, and I believe that the piece of property that was involved in this was closed by another lawyer.

Q   So, this Ms. West was securing this note with her property in Fulton County?

A   I believe that's right, and I believe that property in Fulton County was subsequently sold and was handled, if I think about it, I believe it was a lawyer named Gary Harris.

Q   So, you will look in your files to see if you can find that.

A   Yes, I will.

Q   All right.

A   I will.

MS. DUKE:  Any further questions of Mr. Peek?

(No response.)

MS. DUKE: Thank you, Mr. Peek.

THE WITNESS: Thank you very much, Meriam. I appreciate it a lot. Thank you, ladies and gentlemen. Thank you again.

(Witness excused at 10:45 A.M.)

CERTIFICATE

GEORGIA

BIBB COUNTY

I, Linda C. Johnson, being a Certified Court Reporter and Notary Public in and for the State of Georgia at Large, certify that the foregoing transcript is a true and accurate record of the said proceedings; that I am neither a relative nor employee nor attorney nor counsel of the parties, nor a relative nor employee of such attorney or counsel, nor financially interested in the action.

IN WITNESS WHEREOF, I have hereunto affixed my hand and official seal at Macon, Bibb County, Georgia, this the 8th day of October 1987.

/s/ Linda C. Johnson
Linda C. Johnson, CCR,A–777
Notary Seal
CCR Seal